*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0327P (6th Cir.)
File Name: 00a0327p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

Roger Boggs,
  *Petitioner-Appellee,*

  *v.*

Terry Collins, Warden,
  *Respondent-Appellant.*

No. 99-3325

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 94-00209—Sandra S. Beckwith, District Judge.

Argued: May 5, 2000

Decided and Filed: September 18, 2000

Before: ENGEL, JONES, and COLE, Circuit Judges.

———————

**COUNSEL**

**ARGUED:** Stuart W. Harris, ASSISTANT ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellant. Kort W. Gatterdam, ASSISTANT STATE PUBLIC DEFENDER, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellee. **ON BRIEF:** Stuart W. Harris, ASSISTANT ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellant. Kort W. Gatterdam,

1

ASSISTANT STATE PUBLIC DEFENDER, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

NATHANIEL R. JONES, Circuit Judge. Respondent-Appellant Terry Collins, Warden of the Warren Correctional Institute in Lebanon, Ohio, appeals the district court's grant of Petitioner-Appellee Roger P. Boggs's § 2254 habeas petition. For the reasons stated herein, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

**I.**

On May 16, 1988, after a two-day trial in the Adams County, Ohio Court of Common Pleas, a jury convicted Boggs of the rape, kidnaping, and felonious assault of Elizabeth Berman. The court sentenced Boggs to fifteen to twenty-five years' imprisonment for rape, and eight to fifteen years' imprisonment for felonious assault, to be served consecutively. Boggs is currently incarcerated at the Warren Correctional Institution in Lebanon, Ohio.

**A.**

At trial, Berman testified that around eight or nine p.m. on Christmas Eve, 1988, Boggs knocked on her door and asked to use her bathroom. Berman agreed, and after using the bathroom, Boggs approached her and began making sexual advances. She refused, and as his advances became more aggressive, she screamed "about four times really loud." J.A. at 130. According to Berman, Boggs then hit her on the side of the head, put a pillow over her face, and threatened to kill

judgment of the district court and **REMAND** for further proceedings consistent with this opinion.[11]

---

her if she continued screaming. For about ninety minutes,[1] he repeatedly raped her vaginally, orally and anally.[2] Boggs eventually left her apartment, after which Berman telephoned her mother, who testified that she received the call around ten-thirty. After arriving at Berman's apartment, her mother first took her to the apartment manager and the police to report the incident, and then to a hospital emergency room. Berman's mother testified that Berman initially was reluctant to say who had raped her. As they left the apartment building, however, she indicated that Boggs was the perpetrator.

Dr. Randall Volk, the emergency room doctor who examined Berman that evening, testified that she suffered several injuries consistent with the attack she had described. Although he did not find any injuries to the vulva or the vagina, he found a small rectal and anterior anal laceration that he determined to have been caused very recently. J.A. at 193-94. He also described bruises and contusions above her left eye, an episclera hematoma in her left eye consistent with a "striking blow," and an abrasion on her chest.

Other witnesses for the prosecution testified that they had seen Boggs in an apartment complex (Eddie's Apartments) adjacent to Berman's complex (Glendale Apartments) on the evening in question. Cathy Jordan testified that she saw Boggs four times that evening. Boggs entered her family's residence once and left soon thereafter. He knocked on her door two additional times, asking to be let in. He appeared drunk, staggering and slurring his speech. Jordan testified that his presence and tone, although not "all that forceful," scared her. J.A. at 209. On the fourth occasion, Jordan saw Boggs peeking in the window of an apartment across the parking lot. Eva White next testified that she, too, had

---

[11]Despite our conclusion that the facts of this case do not implicate the Confrontation Clause, the regime that the Ohio Supreme Court erected in *State v. Boggs*, 588 N.E.2d 418 (Ohio 1992) may well implicate the Confrontation Clause in other circumstances. As explained *supra*, if a defendant seeks to show that a prior false accusation bears on a witness's bias, motive or prejudice, a trial court may be constitutionally required to allow a defendant to cross-examine on that accusation, as well as to allow the defendant to "make a record from which to argue why" the witness was biased or prejudiced. *Davis*, 415 U.S. at 318. In a case where the Confrontation Clause is implicated, the *Boggs* regime may have to give way, depending on the extent of cross-examination permitted and the interest-balancing analysis required under cases such as *Michigan v. Lucas*, 500 U.S. at 149-50. But that is not this case.

---

[1]Berman testified that she was not certain precisely how long the attack lasted. J.A. at 154.

[2]Berman testified that Boggs only ejaculated one time, when he forced her to perform oral sex at the end of the assault, and that she immediately disposed of his semen in the bathroom. J.A. at 134-35.

encountered Boggs that evening; clearly drunk, "[h]e came to my door and said he was the friendly maintenance man." J.A. at 215. After refusing to let him in, she retrieved a crow bar in case he returned. Other witnesses testified that Boggs was drunk on the night in question, while his probation officer and a deputy sheriff, respectively, testified that Boggs later had told them that he was so drunk that he would "not be surprised at anything," J.A. at 227, and that he could not remember what he had done for a number of days.

Boggs's cross-examination of Berman adduced that she was a past drug user who had a long history of mental illness. She further acknowledged that, for many years, she had undergone psychiatric treatment for schizophrenia-like conditions and depression, and that she had experienced "psychotic episodes" in which she would "lose touch with what's real and what's not real." J.A. at 148; *State v. Boggs*, 624 N.E.2d 204, 206 (Ohio Ct. App. 1993). She had previously been hospitalized seven times for these conditions, the last time being six or seven years before the trial (around 1983). She had been treated for those conditions and drug abuse ever since, and was in psychiatric therapy at the time of the trial.

On cross-examination, Berman also described her attacker's appearance. He had two tattoos—one on his shoulder and one on his back. He had "[d]ark brown hair and [was] a lot bigger than me." J.A. at 151. She did not remember how he was dressed, his facial hair, or how he wore his hair, stating that she does not generally notice whether a man is bearded or clean shaven. She testified that her attacker did not smell of alcohol, and did not appear to be intoxicated. She also reiterated that she had screamed loudly prior to the attack, and acknowledged that her apartment walls were thin.

Testifying in his own defense, Boggs stated that he had been in Berman's apartment several times prior to Christmas Eve, 1988, and that he had shown her his tattoos then. He also stated that he had stopped by Berman's residence on the day in question: "I stopped [by] earlier that morning, I was

In sum, Boggs enjoyed an opportunity to present a full and meaningful defense to the crimes with which he was charged. In addition to other strategies he pursued, he put forth considerable evidence attacking Berman's credibility based on her history of mental illness and substance abuse, and he hammered this testimony home to the jury in his closing argument. This circumstance is thus unlike *Chambers*, 410 U.S. at 302 (holding that Chambers was denied the right to present a defense when he was forbidden outright from cross-examining a key witness due to an antiquated "voucher" rule, and when the trial court did not allow him to call three favorable witnesses), and *Crane*, 476 U.S. at 690-91 (holding that Crane's right to present a defense was trammeled when, with no valid state justification, he was wholly barred from testifying about the manner in which his confession was obtained). Finally, we do not find that the added benefit to Boggs of presenting evidence of the alleged prior false accusation comprised an interest so weighty that it was constitutionally guaranteed. Indeed, Boggs wished to ask the jury to make a tenuous evidentiary inference from a situation that, even taken as true, deviated significantly from the Christmas Eve attack. While the trial court had discretion to allow in such evidence or to allow a retrial of the case after having heard the testimony for itself, the Constitution does not require it to have done so.

## V.

While Boggs sought to cross-examine Berman on an alleged false accusation of rape, he desired to do so to attack further her general credibility. Under *Davis* and *Van Arsdall*, that purpose alone does not implicate the Confrontation Clause. Nor, on the facts of this case, did the restriction trammel Boggs's constitutional right to mount a full and meaningful defense. For these reasons, we **REVERSE** the

hollow. The physical evidence shows persuasively that she did not "make up" the attack.[10]

Finally, the exclusion of the particular evidence did not trample Boggs's right to present a defense given the considerable latitude the trial court granted Boggs in pursuing his theory that Berman fabricated the rape charge due in part to her history of mental illness and drug use. As explained *supra*, over the government's objections, the trial court allowed Boggs to cross-examine Berman on her history of mental illness, including the fact that her doctors had found her to lose touch with reality, that she remained in therapy with a psychiatrist, and that she had been treated for substance and drug abuse. Boggs also questioned Berman's mother extensively about her daughter's history of mental illness and substance abuse. In its closing argument, Boggs's counsel reminded the jury of this testimony:

> Liz Berman admittedly testified that the last fourteen years she's suffering from mental illness. She receives [social security] because she is mentally ill. She's abused drugs and has received treatment for that. That particularly she's had schizophrenia and psychotic episodes; lost touch with reality. She's told the neighbors about two months ago that she has had nightmares. Now that doesn't mean Liz Berman's a bad person. But it does put some question on her ability to remember how all of this happened and determined [sic] whether they were real or unreal.

J.A. at 320.

---

[10]Boggs suggested in closing argument that perhaps Berman's wounds were self-inflicted. Perhaps she "had a nightmare and fell down and said she was raped. . . . I don't know. I don't think you know." J.A. at 323-24. This speculation was not supported by any evidence, and the only medical testimony adduced at trial was that the wounds were consistent with the physical attack that Berman had described.

leaving and I pecked on the door [to] see if Gary [Rothwell, his boss and Berman's boyfriend] had made it in . . . and I told her when Gary come in, 'Merry Christmas,' and I went on my way." J.A. at 271. Over the remainder of the day, Boggs testified, he drank with a number of people. Between seven and nine o'clock that evening, he drank at his brother's house, went to a party at a friend's house, "and from there I just went all over the neighborhood," visiting different neighbors' homes. J.A. at 273. After nine, Boggs explained, "I was just roaming" around a nearby apartment complex, "aggravating everybody in the whole wide world." J.A. at 287. While Boggs's mother, in a deposition, stated that Boggs arrived home at ten-fifty that evening,[3] he stated that he could not remember what time he arrived at her house. J.A. at 287. He also denied having seen Eva White that evening, and having been to Berman's apartment at any time that night. Finally, he denied having told the deputy sheriff and probation officer that he was too drunk to remember his actions, although he did acknowledge that he told his mother on Christmas day that if he "did [rape Berman, he] didn't remember." J.A. at 280.

Neither hair (other than Berman's) nor semen was found on Berman's person or clothing, or anywhere in her apartment.[4] At trial, Boggs showed the jury that he had fourteen large tattoos covering his entire upper torso. Exhibits introduced during his testimony also showed that Boggs had a full beard at the time of the alleged attack. Several of Berman's neighbors testified that on the night in question, they did not hear screams from her apartment. Several witnesses also

---

[3]At that time, Boggs was residing with his mother at the Glendale Apartment complex.

[4]On cross-examination, the investigator who testified as to the absence of semen or hair samples acknowledged that, more often than not, hair samples of a rapist are not "interchanged" with the victim. J.A. at 295. She also testified that if a rapist ejaculated in the mouth of a rape victim, as Berman testified Boggs had done, she would not be surprised not to find seminal fluid at the crime scene.

testified that they saw him at various times between roughly seven and nine p.m.: Cathy Jordan testified that she saw him four times, between seven-thirty and nine; April Jones saw him around seven-fifteen; Rodney Denning stated that Boggs stopped by his home for about ten minutes between eight and nine o'clock. Samuel and Paula Freeland each stated that Boggs was at their residence for about fifteen minutes sometime between eight and ten p.m., with Paula Freeland estimating that it was most likely between nine and nine-thirty. None of the witnesses confirmed Bogg's written alibi that he was at friends' houses between ten and ten forty-five. J.A. at 284-85. Those who witnessed him stated that Boggs appeared very drunk, with some testifying that they could smell alcohol on him.

### B.

This appeal centers on the trial court's decision to limit Boggs's cross-examination of Berman. Specifically, Boggs sought to question Berman about a false accusation of rape that she allegedly made against another man approximately one month before she accused Boggs of rape. Boggs also sought to introduce the testimony of two witnesses, Wilma Copas, the apartment manager, and Rick Yazell, another tenant, concerning the prior false accusation. According to Boggs, Copas would have testified that Berman told her that she had been raped by Yazell, and Yazell would have testified that the accusation was untrue. The trial court, however, prohibited all questioning concerning the alleged accusation. The dialogue at trial was as follows:

[Boggs's counsel]. Miss Berman, have you ever accused anybody else of having raped you in the past?

[Prosecutor:] Objection, your Honor.

The Court: Sustained

. . .

admission. Because adopting this argument would carve out a troubling exception to our evidentiary inclinations in only the sexual assault and rape context, and cement that exception into our interpretation of the Constitution, we reject his argument. *See generally Lopez v. Texas*, 18 S.W.3d 220, 223-25 (Tex. Crim. App. 2000)(criticizing court decisions providing an exception to evidentiary rules for prior false accusations of sexual abuse).

Moreover, on close examination, the prior accusation characterized by Boggs differs in important ways from Berman's account of the attack by Boggs. According to Boggs, Berman simply fabricated an accusation against Yazell out of whole cloth. This, Boggs suggests, was consistent with Berman's history of mental illness and past "delusions and hallucinations." Boggs's Br. at 12-13. In other words, she simply "made up" the event, "cry[ing] Wolf." In contrast, the physical evidence strongly supports Berman's claim that she suffered from a violent physical and sexual attack on Christmas Eve, 1994. Dr. Volk found that an anterior rectal and anal laceration had occurred "very recently" and was still "freshly bleeding," J.A. at 193-94, and described bruises and contusions above her left eye, an episclera hematoma in her left eye consistent with a striking blow, and an abrasion on her chest that appeared to result from "something [] scratch[ing] down her neck and chest." J.A. at 194. He further stated that these injuries were consistent with the violent physical assault and rape Berman had described. Police also found blood stains on a bed sheet and on Berman's robe. J.A. at 295-96, 365. This medical testimony went unchallenged by Boggs, and Boggs failed to adduce testimony as to other possible sources of such injuries. Given these very real injuries, Boggs's allegation that Berman wholly fabricated on a previous occasion would thus have carried only marginal probative value as to whether she accurately identified Boggs as the perpetrator of the attack that she clearly endured. In other words, Boggs's suggestion at trial that the prior alleged fabrication shows "she's made it up again" and that "she's made up all of this" simply rings

state and federal rulemakers have "broad latitude" under the Constitution to establish rules excluding evidence from criminal trials, *United States v. Scheffer*, 523 U.S. 303, 308 (1998), the Supreme Court has tread carefully when assessing whether the exclusion of certain evidence amounts to a constitutional violation. Rules excluding evidence "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purpose they are designed to serve.'" *Id.* (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). The exclusion of evidence is arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused." *Id.*; *see Wong v. Money*, 142 F.3d 313, 325 (6th Cir. 1998).

Given these standards, we do not find that the exclusion of the testimony regarding the prior rape accusation implicated Boggs's constitutional right to present a defense. First, this evidence was not so highly probative of the charges against Boggs so as to be constitutionally required. Boggs was asking the jury to infer that the alleged prior incident meant that Berman was also accusing Boggs falsely. But our rules of evidence generally frown upon using evidence of past "wrongs" or "acts" to show "the character of a person in order to show action in conformity therewith" on a later occasion. *See* Fed. R. Evid. 404(b); Ohio R. Evid. 404(b); *see also Hughes*, 641 F.2d at 793. Similar concerns anchor Rule 608's prohibition of extrinsic evidence to prove "[s]pecific instances of the conduct of the witness [] for the purpose of attacking or supporting the witness's character for truthfulness," and placing within the discretion of the trial court whether to allow cross-examination on specific conduct when it is "probative of truthfulness or untruthfulness." Fed. R. Evid. 608(b); *see also* Ohio Evid. R. 608(b). Such rules are designed to prevent distracting mini-trials on collateral matters. *See United States v. Riddle*, 193 F.3d 995, 998 (8th Cir. 1999). Boggs asks us not only to look past the skepticism expressed through such bedrock rules, but to hold that Berman's alleged past false accusation of rape was so probative of both her credibility and the reliability of her accusation against Boggs that the Constitution required its

[Boggs's counsel]: Your honor, I have testimony to present that she told Mrs. Copas that Rick Yazell raped her approximately a month before this time and Rick Yazell will testify that he did not.

[Prosecutor:] So what?

[Boggs's counsel]: Well, she's made it up again, that's what I want to find out if she's made up all of this.

The Court: The only thing would be the credibility aspect and yet we're going right back in the back door.

[Boggs's counsel]: I'm not asking about her sexual activity with other people. All I'm asking is if she ever accused someone else before.

[The court sustained the objection]

J.A. at 161-62.

Later, before Boggs began direct examination of Copas, the State requested that the court preclude any questions about the alleged prior false accusation. Boggs's counsel responded that "if she's previously cried 'wolf,' I think that's pertinent. . . . [Berman] informed this woman that somebody had raped her about a month earlier, and there was nothing happened." J.A. at 241. The court agreed with the State, and barred examination on this subject.

### C.

After the jury convicted Boggs, Boggs raised six assignments of error on appeal, including that the trial court improperly restricted cross-examination on the alleged prior false accusation. On May 29, 1991, Ohio's Fourth District Court of Appeals reversed Boggs's conviction based on the prior false accusation issue. *See State v. Boggs*, No. CA 494, 1991 WL 13735 (Ohio Ct. App. 1991) Assuming that the trial court had precluded the cross-examination pursuant to Ohio's rape shield law, Ohio Rev. Code Ann. § 2907.02(D)

(Anderson 1989), the court concluded that a false accusation of rape does not fall within the definition of "sexual activity" under the rape shield law, and should not be excluded on that ground. The court also noted that "[i]t is well settled that criminal defendants have the right to confront the witnesses against them under both the Sixth Amendment to the United States Constitution and under . . . the Ohio Constitution." *Id.* at *8. Finding that Boggs's conviction turned substantially on Berman's credibility, the court concluded that it was "'imperative that the defendant be given an opportunity to place before the jury evidence so fundamentally affecting the complainant's credibility.'" *Id*. at *7 (quoting *People v. Mikula*, 269 N.W.2d 195, 199 (Mich. Ct. App. 1978)). The court reasoned further that "it is difficult to imagine a more 'imperative' category of defense evidence than that which shows the proclivity of a complainant to make rape accusations." *Id.* Finding its conclusion to conflict with that of another Ohio appellate court, the court certified the case to the Ohio Supreme Court.

The Ohio Supreme Court agreed with the court of appeals that false accusations of rape where no sexual activity is involved do not fall within Ohio's rape shield statute. *See State v. Boggs*, 588 N.E.2d 813, 816 (Ohio 1992). Rather, cross-examination of a rape victim regarding prior accusations of rape is governed by Ohio Evid.R. 608(B). *See id*. The court then set forth a procedure for trial courts to follow in such situations:

> [I]f defense counsel inquires of an alleged rape victim as to whether she has made any prior false accusations of rape, and the victim answers no, the trial court would have the discretion to determine whether and to what extent defense counsel can proceed with cross-examination. However, if the alleged victim answers in the affirmative, the trial court would have to conduct an *in camera* hearing to determine whether sexual activity had been involved. If the trial court determined that the accusations were entirely false (that is, that no sexual activity had been involved) the trial

explained or detailed Berman's mental disorder, as did the courts in *Lindstrom* and *Society of Independent Gasoline Marketers of America*. Indeed, it does not appear that the defense sought to examine Berman's mental history beyond its cross-examination of Berman and her mother.

In *Dorsey,* when faced with a similar situation where considerable cross-examination had been permitted as to a government witness's prior mental treatment, this Court held that when "it is merely the extent of cross-examination that is limited, the trial judge retains a much wider latitude of discretion." *Dorsey*, 872 F2d. at 167. "Once cross examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied." *Id.* Given the considerable cross-examination of Berman's past mental condition and treatment, we believe that the jury had sufficient information to assess Boggs's argument that her history of mental illness cast doubt on her accusation against Boggs, satisfying the Confrontation Clause.

## IV.

Boggs also argues that because he was precluded from introducing crucial evidence in his favor, the proceedings below deprived him of his constitutional right to present a full defense. We disagree.

The right to present a complete and meaningful defense emerges from the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984). In circumstances where procedural rules or trial court decisions have excluded evidence in a way that denies a defendant a fair trial, the Supreme Court has found a violation of that defendant's right to present a defense. *See Crane*, 476 U.S. at 690 (finding that the trial court violated Crane's right to present a defense when it excluded evidence bearing on the credibility of his confession); *Chambers*, 410 U.S. at 302 (invalidating a state's hearsay rule because it violated a defendant's right to present witnesses in his own defense). At the same time, finding that

court precluded evidence that a witness was, at the time of events in question, being treated for mental illness rendering him delusional and hallucinatory).

Unlike cases such as *Lindstrom* and *Greene*, the trial court below granted Boggs considerable leeway in cross-examining Berman on her history of mental illness. Outside of the presence of the jury, the trial court heard Berman describe her past treatment for mental illness and substance abuse, concluding that "it would be certainly unfair under the circumstances to not permit the defendant to at least inquire as to whether or not the doctor at times felt like she was out of touch with reality." J.A. at 144-45. Therefore, over the objection of the prosecutor, the court permitted Boggs to elicit from both Berman and her mother that doctors had previously found her to have suffered psychotic episodes in which she had lost touch with reality. J.A. at 148. The defense also elicited that Berman had been hospitalized for mental illness and substance abuse on numerous occasions in the past, with her last hospitalization having been approximately six or seven years before the events in question. Berman also testified under cross-examination that she had been undergoing treatment for substance abuse and mental health in the years since that hospitalization, although both she and her mother testified that her condition had improved in recent years. J.A. at 165. The witnesses spoke ambiguously about the specific mental infirmity Berman suffered, noting that she was "sometimes" schizophrenic or showed "schizophrenia-like" tendencies, and had suffered depression, psychotic episodes, and nightmares. J.A. at 148, 177. Boggs also elicited that she received social security benefits due to her mental illness. This wide-open inquiry into Berman's mental health starkly contrasts with cases such as *Lindstrom*, where the jury "was denied any evidence on whether [a] key witness was a schizophrenic, what schizophrenia means and whether it affects one's perceptions of external reality," 698 F.2d at 1168, and *Greene*, where the defense was "absolute[ly] prohibit[ed]" from inquiring into a key witness's recent history of mental instability. 634 F.2d at 276. Nor did the court at any point limit other evidence that may have further

court would then be permitted to exercise its discretion in determining whether to permit defense counsel to proceed with cross-examination of the alleged victim. We therefore hold that where an alleged rape victim admits on cross-examination that she has made a prior false rape accusation, the trial judge shall conduct an *in camera* hearing to ascertain whether sexual activity was involved and, as a result, would be prohibited by R.C. 2907.02(D), or whether the accusation was totally unfounded and therefore could be inquired into on cross-examination pursuant to Evid.R. 608(B).

*Id.* at 816-17. The court also established a *per se* rule that prior false allegations of sexual assault "are an entirely collateral matter," and therefore "may not be proved by extrinsic evidence." *Id.* at 817. Finally, the court explained that this approach did not violate the Confrontation Clause. *See id.* ("The rights to confront witnesses and to defend are not absolute and may bow to accommodate other legitimate interests in the criminal process."). Accordingly, the court reversed and remanded Boggs's case to the trial court to conduct an *in camera* hearing. *See id.* at 818.

On May 11, 1992, the trial court held a hearing on Berman's alleged prior false accusation of rape. At the hearing, Berman denied having made any such accusation. J.A. at 549-50. When Boggs sought to introduce the contradictory testimony of Yazell and Copas, the trial court refused to hear it, although it allowed Boggs's attorney to summarize their accounts. J.A. at 552-53 (proffering that Copas stated that Berman told her "three to five weeks prior to the allegations against Mr. Boggs . . . that Rick Yazell had raped her," and that Yazell stated that he did not have a sexual relationship with Berman in the four months prior to the allegations against Boggs). Crediting Berman's testimony, the court found no reason to reopen the case and denied Boggs's request for a new trial. J.A. at 557.

On May 6, 1993, the Ohio Court of Appeals again reversed the trial court, concluding that Boggs should have been

permitted to introduce extrinsic evidence of the prior false accusation at the *in camera* hearing. *See State v. Boggs*, 624 N.E.2d 204, 208 (Ohio Ct. App.1993). It remanded for a new *in camera* hearing, instructing that if the prior accusations were unfounded and did not involve sexual activity, Boggs should have been permitted to cross-examine the witness on this issue before the jury, and that a new trial would be required. *See id.* at 210. Regarding Boggs's constitutional argument, the court concluded that it was bound by the Ohio Supreme Court's conclusion that the Confrontation Clause was not implicated. *See id*. While the trial court held a second *in camera* hearing pursuant to this remand, Boggs appealed the constitutional aspect of the ruling to the Ohio Supreme Court.

On August 3, 1993, after having conducted an *in camera* hearing in which Copas and Yazell testified,[5] the trial court denied Boggs's request for a new trial and reaffirmed his convictions. It concluded that Berman had shown by clear and convincing evidence that she had not made any prior accusations of rape. J.A. at 990-91. Boggs did not appeal this decision. On November 24, 1993, the Ohio Supreme Court declined to hear the constitutional issue on appeal for a second time. *See State v. Boggs*, 622 N.E.2d 657 (Ohio Sup. Ct. 1993).

---

[5] There is no record of this hearing. An affidavit signed by Boggs's defense counsel at the time stated that Copas, the apartment manager, testified that in November or early December 1988, she received a phone call from Berman, and that Berman claimed that Yazell, another tenant, had pulled a knife on her and raped her. J.A. at 1445. She further stated that despite her suggestion that Berman call the police about the incident, Berman did not do so; she also testified that when she asked Yazell about the allegation, he denied it. Next, Yazell, a neighbor of Berman, testified. He stated that he never assaulted Berman, and that when Copas asked him about Berman's charge, he had denied it. He also stated that he was never questioned by the police about the allegation. Finally, Berman testified at the hearing. She claimed that she only told Copas that Yazell had threatened and slapped her, and not that he had raped her.

(11th Cir. 1983), courts hold that the decision of whether or not to allow in evidence of a witness's mental illness falls within the broad discretion of trial courts as they balance possible prejudice versus probative value. *See, e.g.*, *United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991) (stating that the district court "has broad discretionary authority to prohibit cross-examination," including the extent to which it allows examination about a witness's condition of mental instability)(Breyer, C.J.); *United States v. Bari*, 750 F.2d 1169, 1178-79 (2d Cir. 1984) (finding no abuse of discretion when trial judge would not permit cross-examination on witness's prior hospitalization for schizophrenia); *United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) ("Of course, a history of mental illness is not necessarily admissible as impeachment evidence."). Factors a court should consider in allowing in such evidence are the nature of the psychological problem, the temporal recency or remoteness of the condition, and whether the witness suffered from the condition at the time of the events to which she is to testify. *See United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995). Consistent with these cases and *Davis*, some courts have found Confrontation Clause violations when a witness's mental condition was relevant to a defense theory of motive or bias, or when the condition was sufficiently severe as well as so closely tied to the events in question so as to cast doubt on that witness's ability to perceive or interpret the events in question. *See, e.g.*, *Lindstrom*, 698 F.2d at 1160-64 (reversing a conviction because the trial court limited cross-examination and prohibited the defense from accessing the psychiatric records of the government's star witness, and because defense's theory was that the witness's severe and ongoing mental illness had given her an improper motive for accusing the defendant of wrongdoing); *Greene v. Wainwright*, 634 F.2d 272, 275-76 (5th Cir. 1981) (granting habeas petition because trial court had not allowed cross-examination on witness's history of mental illness, which prohibited "any exploratory inquiry by defense counsel into [the witness's] possible bias or motive"); *United States v. Society of Indep. Gasoline Marketers of Am.*, 624 F.2d 461, 469 (4th Cir. 1979)(finding abuse of discretion when a district

articulating a theory of motive or partiality does not implicate the rights carefully outlined in *Davis*.[9]

Finally, both Boggs and the magistrate court indicate that the intended cross-examination went to Berman's "state of mind" in bringing the rape charges against Boggs, and was therefore compelled by the Confrontation Clause. *See* J.A. at 1456 (stating that the evidence defense counsel sought to elicit on cross-examination "was highly relevant to the issues of the victim's credibility and her motives or *state-of-mind* in bringing the rape charge")(emphasis added); Boggs's Br. at 13 (echoing the magistrate court that the jury "was entitled to consider her motives or *state of mind* in bringing the rape charges against Mr. Boggs")(emphasis added). It is not clear to us how this unspecified "state of mind" justification fits within the constitutional analysis required by *Davis* and its progeny. However, both at trial and on appeal, Boggs pointed to Berman's history of mental illness to cast doubt on the reliability of her accusations against Boggs. To the extent that this reference to Berman's "state of mind" is an extension of that argument, we do not find a Confrontation Clause violation.

While mental illness can indeed be relevant to a witness's credibility, *see United States v. Butt*, 955 F.2d 77, 82 (1st Cir. 1992); *United States v. Lindstrom*, 698 F.2d 1154, 1161-64

---

[9]Our care in adhering to this distinction arises in part from the general concern raised by the Ohio Supreme Court that a clearly articulated rule, whether it be a rule of constitutional law or one of evidence, be applied consistently. *See generally Boggs*, 588 N.E.2d at 817 (stating that evidentiary rule should not be applied differently "merely because the charge is one involving a sexual assault"). To allow Boggs to prevail on his argument that the Confrontation Clause compels cross-examination even when his purpose was to attack Berman's credibility generally would carve out a troubling exception in the rape context to an otherwise clear and uniform rule. *See generally* Denise R. Johnson, *Prior False Accusations of Rape: Falsus in Uno, Falsus in Omnibus*, 7 YALE J.L. & FEMINISM 243 (1995) (examining the origins and implications of courts' treating prior accusations differently than other types of credibility evidence).

---

### D.

On March 17, 1994, Boggs brought this habeas corpus action pursuant to 28 U.S.C. § 2254. Among other arguments, he contended that he was denied both his Sixth Amendment Confrontation Clause right and his constitutional right to present a defense. After the district court dismissed the petition without prejudice because Boggs had not exhausted his state remedies, this Court reversed and remanded for consideration of the merits. *See Boggs v. Brigano*, No. 94-4000, 1996 WL 160822 (6th Cir. Apr. 4, 1996) (unpublished opinion).

Following the remand, the magistrate court issued a report and recommendation that the writ be granted. The court found that the trial court's preclusion of cross-examination on the alleged prior accusation violated Boggs's Confrontation Clause rights and his right to present a defense. "Based on the present record, it appears the restriction prohibiting defense counsel from cross-examining the victim was unreasonable." J.A. at 1456. Moreover, the magistrate court concluded that the evidence Boggs sought to elicit through cross-examination was highly relevant, in part because of the paucity of physical evidence supporting Berman's account. "[T]he restrictions imposed totally precluded him from introducing evidence which . . . could have undermined the victim's credibility and exposed her motives and state-of-mind as related directly to the rape charge at issue." J.A. at 1463. The court further concluded that the error was not harmless. The district court rejected each of the State's objections, and adopted the magistrate court's report and recommendation.

### II.

This court reviews *de novo* a district court's grant of a writ of habeas corpus. *See Barker v. Yukins*, 199 F.3d 863, 870 (6th Cir. 1999). We review the district court's findings of fact for clear error. *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). Primary or historical facts found by state courts are "presumed correct and are rebuttable only by clear

and convincing evidence." *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). District court findings of fact based upon its review of state court records or written decisions receive plenary review. *See Caldwell v. Russell*, 181 F.3d 731, 735 (6th Cir. 1999). Determinations of federal law, or determinations involving mixed questions of fact and law, receive *de novo* review. *See Mapes*, 171 F.3d at 413. State court interpretations of state law generally bind the federal reviewing court. *See Caldwell*, 181 F.3d at 735-36.

### III.

A federal court may issue a writ of habeas corpus to correct a state trial if the state proceeding was rendered fundamentally unfair by a violation of the Constitution, the laws, or the treaties of the United States. *See* § 28 U.S.C. 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Schotten v. Norris*, 146 F.3d 314, 323 (6th Cir. 1998). Thus, amid the many complicating wrinkles in this trial and ensuing appellate proceedings, §2254 narrows our inquiry to one central question: was the Constitution violated when Boggs was precluded from cross-examining Berman on an alleged prior false accusation of rape? Bound by clear Supreme Court precedent, we are constrained to hold that it was not.

### 1.

The Sixth Amendment guarantees the criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. At the core of the Confrontation Clause is the right of every defendant to test the credibility of witnesses through cross-examination. *See Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *Mayes v. Sowders*, 621 F.2d 850, 855 (6th Cir. 1980). The Supreme Court has emphasized that cross-examination is more than a desirable rule of trial procedure; rather, it is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316; *see also Chambers v. Mississippi*, 410 U.S. 284, 295 (1974); *Pointer v. Texas*, 380 U.S. 400, 404 (1965). At the same time, a trial court has discretion to limit the scope of cross-examination. *See*

another man when that relationship tended to show a motive to testify falsely. *See* 488 U.S. at 232. In *United States v. Stamper*, 766 F. Supp. 1396, 1400 (W.D.N.C. 1991), on which Boggs and the lower court heavily rely, the defendant attempted to show that prior accusations revealed the accuser's motive to move her residence from the home of one parent to another. Because the defendant was entitled "to set before the jury the proffered evidence of ulterior motives of the complainant," the trial court's bar on that evidence violated the Sixth Amendment. *Id.* The *Stamper* Court emphasized that Stamper did not wage a general credibility attack aimed to show a "propensity to fabricate," but instead sought to develop evidence of ulterior motive. *Id.* at 1402. Similarly, in *Wealot v. Armontrout*, the Eighth Circuit disapproved of a trial court's limitation of a defendant's effort to show that an accuser "had a strong motive for falsely accusing Wealot." 948 F.2d 497, 500 (8th Cir. 1991). Unlike such cases, all of which mirror the *Davis* Court's focus on the "partiality of a witness" and his or her "motivation in testifying," 415 U.S. at 316, nowhere in the briefs or prior phases of this case has Boggs articulated a similar motive-based theory. Rather, his argument explicitly hinges on Berman's general credibility.[8] Simply labeling this general credibility argument to be one of "motive" without

---

[8] At one instance, according to Boggs's counsel's affidavit describing the second *in camera* hearing, he asked Berman whether "she accused Rick Yazell and Roger Boggs of rape because [her boyfriend] Gary Rothwell had beaten and raped her but she did not want to get Mr. Rothwell in trouble so she blamed Yazell and Boggs." J.A. at 1447. She said she had not. Although this question addressed a possible improper motive in accusing Boggs, Boggs did not pursue this theory at trial, nor did he adduce any evidence in support of it in examining any of the witnesses. Moreover, in the numerous appeals since the conviction, he does not appear to have claimed that he was pursuing such a theory of improper motive.

The magistrate court's opinion went a step beyond Boggs's credibility argument, reasoning that the omitted evidence went to Berman's "motives" in bringing the rape charges against Boggs:

> [D]efense counsel was not attempting to mount a general attack on the victim's credibility but rather more particularly to show that the victim . . . fabricated the rape charges against petitioner. . . . [T]he restriction on cross-examination prevented petitioner from developing facts which more particularly could have undermined the victim's credibility and expose her motives and state-of-mind as related directly to the rape charge at hand. . . . [T]he evidence defense counsel sought to elicit on cross-examination was highly relevant to the issues of the victim's credibility and her motives or state-of-mind in bringing the rape charge against the petitioner.

J.A. at 1455-56.  *See also* Boggs's Br. at 13 (repeating the magistrate court's language that the jury "was entitled to consider her *motives* or state of mind in bringing the rape charges against Mr. Boggs")(emphasis added).  But despite this semantic distinction, we search in vain for the magistrate court or Boggs to have provided an explanation of Berman's motive to testify falsely.

This silence as to a theory of motive sharply differentiates this case from those where courts have found Confrontation Clause violations.  As explained *supra*, an articulated theory that a witness had a motive to fabricate lay at the heart of the *Davis* and *Van Arsdall* defenses.  Similarly, in *Olden*, the Supreme Court found constitutionally improper the court's refusal to allow testimony of an accuser's relationship with

---

attempted to articulate a theory of bias or prejudice on appeal.  Rather, even after cross-examining Berman about the prior incident in later hearings, Boggs has emphasized only Berman's general credibility.  Moreover, unlike *Burr*, we do not find a bias or motive theory to be "apparent" from either the arguments he has since made or from the trial record.

---

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  This includes discretion to impose limits based on concerns about harassment, prejudice, confusion of the issues, witness safety, or interrogation that is repetitive or only marginally relevant.  *See id.*; *King v. Trippett*, 192 F.3d 517, 524 (6th Cir. 1999)(citing *Van Arsdall*, 475 U.S. at 679).  In this way, the Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."    *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)(emphasis in original).

Thus, although *Davis* trumpets the vital role cross-examination can play in casting doubt on a witness's credibility, not all conceivable methods of undermining credibility are constitutionally guaranteed.  In particular, the *Davis* Court distinguished between a "general attack" on the credibility of a witness—in which the cross-examiner "intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony"—and a more particular attack on credibility "directed toward revealing possible biases, prejudices, or ulterior motives as they may relate directly to issues or personalities in the case at hand."  415 U.S. at 316.  The Court, concluding that "[t]he partiality of a witness . . . is always relevant as discrediting the witness and affecting the weight of the testimony," found this latter type of attack to be part of the constitutionally protected right of cross-examination.  *Id*.  Faced with a situation where a trial court barred cross-examination bearing on a witness's bias and motive to testify,[6] the Court

---

[6]In the trial underlying the *Davis* appeal, Davis, charged with burglary, was barred from showing that a key witness against him was on probation for burglary. Davis argued at trial that he was not seeking to introduce that evidence to impeach the witness's character generally. Rather, he aimed to show that the witness was biased in testifying because he was trying to shield suspicions of his own involvement in the crime, and because he may have feared that his own probation was in jeopardy. *See id.* at 319.

concluded that the countervailing state interests "cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320. In a concurrence, Justice Stewart underscored that the Confrontation Clause was implicated only because Davis was seeking to show bias or prejudice. "[T]he Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination" about past convictions. *Id.* at 321 (Stewart, J., concurring).

In *Van Arsdall*, the Court emphasized that *Davis* and prior decisions recognized that "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination.'" 475 U.S. at 678-79 (quoting *Davis*, 415 U.S. at 316-17). It then elaborated that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to *show a prototypical form of bias* on the part of the witness." *Id.* at 680 (emphasis added). The Court therefore criticized the trial court's refusal to allow Van Arsdall to cross-examine a key prosecution witness about the fact that charges of public drunkenness had been dismissed in exchange for his testimony. *See id.* at 679. This limitation foreclosed investigation into an event "that a jury might reasonably have found [to have] furnished the witness a motive for favoring the prosecution in his testimony," and therefore violated the Confrontation Clause. *Id.* Courts after *Davis* and *Van Arsdall* have adhered to the distinction drawn by those cases and by Justice Stewart in his concurrence—that cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not. *See Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (finding error in a trial court's refusal to allow cross-examination on a rape victim's extramarital relationship when that relationship would have shown the victim's bias or motivation); *United States v. Abel*, 469 U.S. 45, 56 (1984) (permitting impeachment evidence that a witness was a member of the Aryan Nation, which showed his potential

would be less likely than the average trustworthy citizen to be truthful in his testimony." 415 U.S. at 316.

But this emphasis on Berman's general credibility overlooks the fundamental distinction drawn in *Davis* and *Van Arsdall*. No matter how central an accuser's credibility is to a case—indeed, her credibility will almost always be the cornerstone of a rape or sexual assault case, even if there is physical evidence—the Constitution does not *require* that a defendant be given the opportunity to wage a general attack on credibility by pointing to individual instances of past conduct. In other words, Boggs's argument that credibility is crucial to this case, and that therefore any evidence bearing on that credibility must be allowed in, simply does not reflect Sixth Amendment caselaw. Under *Davis* and its progeny, the Sixth Amendment only compels cross-examination if that examination aims to reveal the motive, bias or prejudice of a witness/accuser. Because he failed to articulate such an argument either at trial or on appeal, and because there is not a plausible theory of motive or bias apparent from the trial record (including from the *in camera* hearings) or from Boggs's arguments on appeal, Boggs has not demonstrated a Confrontation Clause infraction.[7]

---

[7] We note that our conclusion is not based simply on the fact that Boggs did not articulate a bias or motive justification at the trial itself. As Judge (now Justice) Kennedy explained in *Burr v. Sullivan*, 618 F.2d 583, 587 (9th Cir. 1980), a defendant is not required to articulate a precise theory of bias at the trial level to merit cross-examination, or to later challenge the limitation of that cross-examination as having been in violation of the Confrontation Clause. *See also Alford v. United States*, 282 U.S. 687, 692 (1931)(noting that cross-examination "is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply"); *Dorsey*, 872 F.2d at 167 ("[T]he defense is not required to be able to state beforehand exactly what facts it wishes to elicit . . . ."). Thus, even though a defendant inartfully articulated to the trial court its purpose in cross-examining a prosecution witness, Judge Kennedy found the possibility of bias or prejudice to have been "apparent" (largely because the witness was an accomplice who had not been charged with that or later crimes), and consequently found a Confrontation Clause violation. *See Burr*, 618 F.2d at 586.

Unlike cases such as *Davis* and *Burr*, however, Boggs has not

### 2.

Given these precedents, we must reject Boggs's primary argument because it improperly blurs the precise distinctions drawn in Confrontation Clause jurisprudence. Not having articulated an argument sounding in motive, bias or prejudice, Boggs instead seeks to elevate his purpose—attacking Berman's general credibility—into a constitutionally mandated right. He argues that because Berman's credibility is central to his case, the Sixth Amendment requires that he be allowed to cross-examine her on an incident bearing on that credibility. Because this contention goes beyond the clear sweep of the Confrontation Clause traced by *Davis* and *Van Arsdall*, we cannot accept it as a ground for habeas relief. Nor can we accept the reasoning of the lower courts in granting the writ on this ground.

The record and Boggs's arguments on appeal show that, just as in *Hughes* and *Bartlett*, Boggs's purpose in introducing the alleged prior false accusation was to attack Berman's general credibility. Both at trial and on appeal, Boggs essentially contended that the evidence was crucial because if Berman lied or fabricated once, she would do so again. At the sidebar during the trial, Boggs's counsel explained: "[S]he's made it up again[.] I want to find out if she's made up all of this." J.A. at 161. In his brief before this Court, Boggs repeatedly underscores the importance of the prior accusation in diminishing Berman's general credibility. *See* Boggs's Br. at 13 ("The defense was simply seeking to give the jury additional evidence with which to weigh the alleged victim's credibility."); *id.* at 16 ("[T]he key issue in the instant case was the accuser's credibility. To not allow inquiry into her prior instances of untruthfulness is to render the federal constitutional guarantee to confront and cross-examine meaningless."); *id.* at 26 ("The jury should be able to decide what weight a prior false accusation has on the alleged victim's credibility, not the trial judge."). Thus, Boggs's argument echoes the *Davis* Court's definition of a general attack on credibility—when a party "intends to afford the jury a basis to infer that the witness' character is such that he

bias against a black defendant); *see also United States v. Stavroff*, 149 F.3d 478, 481 (6th Cir. 1998) (discussing *Davis* and *Van Arsdall* in the context of witness motivation and bias); *Dorsey v. Parke*, 872 F.2d 163, 166 (6th Cir. 1989)(noting that in *Davis* and its progeny, courts have distinguished "between the core values of the confrontation rights and more peripheral concerns which remain within the ambit of the trial judge's discretion").

When faced with alleged prior false accusations of rape, federal courts have adhered to the fine line drawn in *Davis* and *Van Arsdall*, finding cross-examination constitutionally compelled when it reveals witness bias or prejudice, but not when it is aimed solely to diminish a witness's general credibility. In *Hughes v. Raines*, 641 F.2d 790 (9th Cir. 1981), the trial court refused to allow defense counsel to cross-examine an alleged rape victim about an alleged prior false accusation of rape. The Ninth Circuit relied on the distinction drawn in *Davis* "between an attack on the general credibility of the witness and a more particular attack on credibility" through revealing biases, prejudices or ulterior motives. *Id.* at 793. Looking closely at the defendant's purpose for introducing the testimony, the Court found that the defense was simply asking the jury to make an inference "that because the complaining witness made a false accusation of attempted rape on a prior occasion, her accusation in this case was false." *Id.* In other words, the intended cross-examination "was not to establish bias against the defendant or for the prosecution; it merely would have been to attack the general credibility of the witness on the basis of an unrelated prior incident." *Id.* Under *Davis*, the *Hughes* Court concluded, limiting cross-examination for that purpose did not violate the Confrontation Clause. *See id.* at 793.

Similarly, in *United States v. Bartlett*, 856 F.2d 1071 (8th Cir. 1988), a rape defendant challenged as unconstitutional the district court's refusal to admit evidence of a victim's alleged prior false accusation of rape. Like the Ninth Circuit, the Eighth Circuit noted the distinction between cross-

examination regarding a witness/accuser's possible biases, prejudices or ulterior motives and cross-examination and evidence introduced simply to attack her general credibility. *See id.* at 1088-89. The court found that the latter purpose—and the inference that "because the victim made a false accusation in the past, the instant accusation is also false," *id.* at 1089—fell below the Sixth Amendment threshold. Because in the case before it, "the evidence of the alleged prior false accusation of rape was offered solely to attack the general credibility of" the victim, the district court's refusal to allow the attempted cross-examination did not violate Bartlett's confrontation rights. *Id.* Other courts have echoed the reasoning from *Hughes* and *Bartlett*. *See, e.g.*, *Hogan v. Hanks*, 97 F.3d 189, 191 (7th Cir. 1996) (noting that *Davis* and other cases did not suggest that "the longstanding rules restricting the use of specific instances and extrinsic evidence to impeach a witness's credibility pose constitutional problems"); *United States v. Berkley*, No. 96-4181, 1997 WL 657007, at *2 (4th Cir. 1997) (unpublished opinion) (finding that alleged prior false accusation had little relevance "to the accuser's credibility or veracity respecting the charge being prosecuted"); *Rowan v. Kernan*, No. C95-01290, 1995 WL 674904, at *1 (N.D. Cal. 1995) (unpublished opinion) (reading *Davis* and *Van Arsdall* to say that while the constitution protects cross-examination if it concerns bias, motive or prejudice, "general attacks on the credibility of a witness do not raise the constitutional concerns which the confrontation clause addresses"); Christopher Bopst, *Rape Shield Laws and Prior False Accusations of Rape: The Need for Meaningful Legislative Reform*, 24 J. Legis. 125, 141 (1998) (noting that whether an alleged false accusation of rape must be admitted under the Confrontation Clause turns on the distinction between proving bias or prejudice and proving general credibility).

Although not directly addressing the Confrontation Clause, this Court adhered to the logic of *Hughes* and *Bartlett* in *United States v. Cardinal*, 782 F.2d 34 (6th Cir. 1986). Cardinal was convicted for rape on an Indian reservation; on appeal, he challenged the district court's refusal, pursuant to

the federal rape shield law, *see* Fed. R. Evid. 412, to allow cross-examination and admit evidence that his thirteen-year old accuser (and niece) had previously reported instances of sexual assault by family members, but had later withdrawn those accusations. *See id.* at 35-36. Cardinal argued that this evidence should have been admitted because it went to the complainant's credibility. Noting the "wide discretion" enjoyed by district courts on such evidentiary matters—except in cases where admission was "constitutionally required"—this Court did not find the lower court's decision to have been an abuse of that discretion. *See id.* at 36. This conclusion also necessarily implied that the cross-examination was not constitutionally required. *See also United States v. Withorn*, 204 F.3d 790, 795 (8th Cir. 2000).

If a trial court has curtailed cross-examination from which a jury could have assessed a witness's bias, prejudice or motive to testify, a court must take two additional steps. First, a reviewing court must assess whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of bias or improper motive. *See Dorsey*, 872 F2d. at 167; *Stevens v. Bordenkircher*, 746 F.2d 342, 347 (6th Cir. 1984). Second, if this is not the case, and there is indeed a denial or significant diminution of cross-examination that implicates the Confrontation Clause, the Court applies a balancing test, weighing the violation against the competing interests at stake. *See Chambers*, 410 U.S. at 295. In *Davis*, the Court found that the state's interest in protecting the anonymity of a juvenile offender was not comparable to the "paramount" interest in the right to show the bias of an adverse witness. *Id.* at 319. In *Michigan v. Lucas*, 500 U.S. 145 (1991), on the other hand, the Court upheld a Michigan rape-shield statute's notice-and-hearing requirement that operated to bar cross-examination in the case in question. Although the Court concluded that the rule could diminish a defendant's ability to confront adverse witnesses, it found that this effect was outweighed by countervailing state interests in protecting rape victims from surprise, harassment and unnecessary invasions of privacy. *See id.* at 149-50.