NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0072n.06

No. 20-5219

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| JAMES EAKES, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:     BOGGS, SUTTON, and NALBANDIAN, Circuit Judges.

BOGGS, Circuit Judge. James Eakes, a former deputy jailer at a Kentucky detention center, appeals his conviction for violating an inmate's Eighth Amendment right to be free of cruel and unusual punishment. Body-camera footage showed him tasing the inmate three times because the inmate had cursed at Mr. Eakes from behind a locked cell door. The inmate was unarmed and naked except for a thick smock worn by suicidal prisoners. And after the first tasing, he was slumped helpless against his cell wall, posing no threat to himself or others.

Mr. Eakes claims that the district court violated his right to confront witnesses against him because it limited his cross-examination of an eyewitness to the tasing. His counsel claimed during a bench conference that the witness had allegedly stolen inmates' belongings and smuggled contraband to inmates, one of whom later died from a drug overdose. The district court allowed questioning about whether the government knew of any allegations against the witness or had used that knowledge to pressure her. But the court forbade Mr. Eakes from broaching the specifics of any

such allegations. Because the Confrontation Clause does not guarantee criminal defendants the right to ask the questions that the district court prohibited, we affirm.

## I.  Factual and Procedural Summary

### A.  *The Tasing*

In May 2015, Victim[1] was in solitary confinement at the Fulton County Detention Center, where Mr. Eakes and Witness were deputy jailers. After Victim told Witness that he had suicidal thoughts, Witness called Mr. Eakes on the radio to assist her with carrying out the protocol for securing a suicidal inmate. The inmate's clothing and belongings are removed from the cell, and the inmate is given only a "suicide smock," a thick, tear-resistant garment designed to be unusable for self-harm or harming others.

A third deputy jailer also assisted in the suicide protocol. She wore a body camera that captured audio and video of the events that followed.

When Victim's cell door opened, Mr. Eakes stood at the doorway. He drew his taser and aimed it at Victim, ordered Victim to remove his clothes and put on the smock, and threatened to "bust [Victim's] ass" otherwise. Victim began to comply, saying "For what? I didn't do nothing." Mr. Eakes responded by entering the cell, yelling, "You do what I tell you to do. I ain't going to put up with your shit. Get [the smock] on or I'll pop your ass right now, buddy." Victim replied that all he had done was say that he had had suicidal thoughts. He objected that it wasn't right that he had to stand "butt naked" in front of Witness and the third jailer (both of whom are women) with a taser pointed at him. As Victim gave Mr. Eakes his clothes, he said he would file a grievance about Mr. Eakes's conduct. Mr. Eakes replied that he didn't care—"I'll do whatever I want to when I want to whether you like it."

---

[1] To maintain the privacy of the victim and the witness at issue in this case, we use pseudonyms.

Witness told Mr. Eakes that Victim needed to take off his socks, and Mr. Eakes ordered him to do so. Victim threw his socks in Mr. Eakes's direction in what Witness would later testify was a "[s]light toss." Mr. Eakes reacted by threatening to "bust [Victim's] ass" again: "Boy, I tell you, that's your last warning. You understand? . . . You don't throw shit at me. I don't give a damn what you are, but you don't throw nothing at me." He put his taser to Victim's temple.

The suicide protocol complete, Victim was dressed only in the suicide smock, and his cell was emptied of his personal belongings. Mr. Eakes left, closing the cell door behind him, which automatically locked. Victim then called Mr. Eakes a "motherfucker" from behind the locked door, and Mr. Eakes directed staff in the control room to reopen the cell. The third jailer tried to dissuade Mr. Eakes from going in, saying that she didn't want him "to end up in trouble." Mr. Eakes ignored that advice.

Once the door opened, Mr. Eakes entered the cell and fired his taser at Victim. Victim went limp against the cell wall and slumped to the floor. Mr. Eakes stood over him, yelling, "How do you like it now? How do you like it? Go ahead and cuss me one more time, why don't you? How do you like it? How do you like it, son? Don't you ever cuss me again. Do you understand me?"

After more words, Mr. Eakes pressed his taser directly against Victim's skin and activated its "drive-stun" mode, again shocking Victim and causing him to scream. Mr. Eakes said, "Don't cuss me again."

Victim cursed at Mr. Eakes again. Mr. Eakes tased Victim again.

Mr. Eakes continued to stand over Victim, yelling, "Now you calm down. Do you understand me? That's your last time." The third jailer said, "We've gotta get Jim out of there," at which point she and Witness urged Mr. Eakes to leave the cell. He finally left, announcing, "I don't play that shit. You know what I'm saying? You don't cuss me or them guards or nothing."

### B. Criminal Proceedings

In the course of an unrelated investigation at the jail, the FBI came across the body-camera footage. A grand jury indicted Mr. Eakes in August 2018, charging him with one count of depriving Victim of constitutional rights under the color of law, in violation of 18 U.S.C. § 242.

The government, planning to call Witness as an eyewitness, filed a motion in limine to prevent Mr. Eakes from questioning her about her misdemeanor convictions and her two firings from (and later rehirings by) the detention center. The district court granted the government's motion. But it permitted Mr. Eakes to cross-examine her on specific conduct probative of truthfulness or untruthfulness so long as his counsel sought permission from the bench beforehand.

Before voir dire, defense counsel advised the court that he wanted to raise "aspects" of Witness's history, including that she had been "fired at the jail for bringing in drugs [and] cell phones to inmates" and that she had been "a suspect in the death of an inmate by providing methamphetamine to them in the jail." Counsel argued that these allegations might have been "used as leverage to get her to cooperate with the government." The district court agreed that counsel could ask if the government had "threatened [Witness] in any way" or offered to "give [her] any favor" but cautioned that he could not "go into that prior misconduct without first approaching the bench."

At trial, Mr. Eakes questioned Witness about an incident report she had written after the tasing. In it, she had written that Mr. Eakes had used the "least amount of force" during the incident, contrary to the implication of her testimony on direct that he had used unreasonable force. She explained that she had falsified the incident report because she had felt that she "was supposed to be on [Mr. Eakes]'s side," not the inmate's, and had believed that Mr. Eakes would have been upset had she written "the truth as to what happened."

Defense counsel then pressed Witness on whether FBI agents had threatened to prosecute her in connection with the tasing or other incidents at the jail and whether those threats had affected

her testimony. She admitted that the agents had raised the possibility of charges, but she denied that the agents had threatened her with those charges or that they had pressured her to testify in a certain way. She testified that she had felt she needed to tell the truth because the tasing had been recorded and she could be charged for lying to the agents.

When counsel attempted to ask "[h]ow many times" Witness had worked for the jail, the government called for a bench conference. There, government counsel reminded the defense that the court had already barred cross-examination about Witness's personnel history. Defense counsel reiterated that he had a good-faith basis to believe that there were allegations against Witness not listed in her disciplinary file—specifically, stealing inmates' property, smuggling contraband, and involvement in the overdose-death. Counsel argued that those allegations were probative of her bias or motive to testify for the government—if the FBI agents knew of them, the agents could have used them to obtain Witness's cooperation. The court directed defense counsel to "stay away from" the "details" of any allegations against Witness but allowed an inquiry into "whether or not the government promised they would not prosecute her on any other type of charges if she testified a certain way."

Counsel concluded cross-examination with several questions about whether the government had used any allegations against Witness to induce her to change her testimony. In fact, the defense probed as specifically as "[D]id the FBI or law enforcement raise the prospect of prosecuting you for other crimes while you were . . . working at the jail during your discussions with them about the facts of this case?"; "They told you they were aware of allegations of certain activities of you at the jail; right?"; and "[D]id you change your version of events after they brought those matters up to you?" Witness acknowledged that the agents had "brought several issues up"

and that they had "questioned" her about things other than the tasing. But she insisted that she had told the government the truth about the tasing from the outset of the investigation.

The jury convicted Mr. Eakes after two days of trial. The district court denied his motion for a judgment of acquittal or a new trial, and it sentenced him to 48 months of imprisonment. This timely appeal follows.

## II. Analysis

The sole question presented is whether the district court erroneously deprived Mr. Eakes of his Sixth Amendment confrontation right by limiting his cross-examination regarding Witness's potential bias, prejudice, or ulterior motive for testifying. Under any standard of review, it did not.

### A. Standard of Review

Our usual first step for a claim of constitutional error is to determine the applicable standard of review. At the outset, the government argues that Mr. Eakes did not preserve his claim of error because he did not adequately inform the district court of the "grounds for admissibility" he now claims for the cross-examination questions. *United States v. Ganier*, 468 F.3d 920, 924 (6th Cir. 2006). Mr. Eakes argues that he preserved it by articulating that his objection rested on Witness's potential bias and motive to testify. If he did preserve his claim, we review for abuse of discretion—which has the effect of reviewing de novo questions of constitutional law. *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006). If not, we review for plain error. *United States v. Collins*, 799 F.3d 554, 584–85 (6th Cir. 2015).

But we reach the same result under either standard, so we need not address the potentially thorny preservation issue. As discussed below, the district court did not err. And because there was no error, there was no plain error, either. *Id.* at 576 ("To satisfy plain-error review, 'there must be . . . error . . . .'" (quoting *United States v. Baker*, 458 F.3d 513, 517 (6th Cir. 2006))).

B.   *The* Boggs *Inquiry*

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. This confrontation right includes "the right of every defendant to test the credibility of witnesses through cross-examination." *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000) (citing *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974)). But that right is limited by a trial judge's "wide latitude" to prevent "harassment, prejudice, confusion of the issues, [threats to] the witness' safety, or interrogation that is repetitive or only marginally relevant," among other things. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

In *Boggs*, we developed a test to assess a potential violation of a defendant's confrontation right. "If a trial court has curtailed cross-examination from which a jury could have assessed a witness's bias, prejudice or motive to testify," then we "assess whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of bias or improper motive." 226 F.3d at 739. If not, we then "appl[y] a balancing test, weighing the violation against the competing interests at stake" to determine whether to set the conviction aside. *Ibid.*

We have previously held in an unpublished opinion that restricting inquiry into the specific charges against a witness does not violate the Confrontation Clause. *United States v. Givhan*, 740 F. App'x 458 (6th Cir. 2018). There, the district court allowed the defendant, charged with human trafficking, to elicit testimony from his victims that they had been charged with "serious" crimes, that one was on probation when she was arrested, and that they had "accepted the government's offer to 'walk' if they helped" convict the defendant. *Id.* at 462. But the court did not let him elicit the witnesses' specific charge: prostitution. *Id.* at 463.

We affirmed, holding that, "[a]lthough the witnesses had an incentive to lie, this motivation arose from the weight of their potential punishment and not from the nature of their suspected

crimes." *Ibid.* We found the defendant's attempt to introduce their prostitution charges on bias grounds to be nothing more than trying to "wage a general attack on credibility by pointing to individual instances of past conduct." *Ibid.* (citing *Boggs*, 226 F.3d at 740). Although the Confrontation Clause "guaranteed Defendant the right to inform the jury that the witnesses had obtained an 'easy out' from potentially serious charges, . . . it did not guarantee Defendant the right to ask about the witnesses' specific crime of arrest." *Ibid.* In fact, because we found that the excluded cross-examination did not lie within the Sixth Amendment's core protections, *id.* at 462, we did not even need to reach the remaining steps of the *Boggs* test in *Givhan*.

*Givhan*'s reasoning applies here too. The district court in Mr. Eakes's case did not "curtail[] cross-examination from which a jury could have assessed [Witness]'s bias, prejudice or motive to testify." *Boggs*, 226 F.3d at 739. It only barred him from asking about the specific details of allegations against her. And here there were no grounds in the record for the allegations against Witness, increasing the potential for unfair prejudice against the government beyond that potential in *Givhan*. Also, as in *Givhan*, Mr. Eakes had ample room to question Witness about whether and how the government's knowledge or use of any allegations against her had affected her testimony.

Although Mr. Eakes argues that the district court prevented him from introducing evidence of those allegations' seriousness, we see nothing in the court's ruling barring him from a generalized inquiry into their gravity—only an admonition to "stay away from" the "details." Those details would have told the jury little about Witness's bias or motive to lie in Mr. Eakes's case. They would have instead allowed him to attack her credibility generally through an impermissible propensity inference. The Confrontation Clause does not give Mr. Eakes a right to do that. *Id.* at 740.

The district court neither abused its discretion nor plainly erred. We AFFIRM.