**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0697n.06
Filed: September 27, 2007

No. 05-1536

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CHARLES HARGRAVE, | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| KENNETH McKEE, Warden, | ) | |
| | ) | **O P I N I O N** |
| **Respondent-Appellee.** | ) | |
| _____ | ) | |

**Before: DAUGHTREY and MOORE, Circuit Judges; SHADUR,** [*] **District Judge.**

**KAREN NELSON MOORE, Circuit Judge.** Petitioner-Appellant Charles Hargrave

("Hargrave") appeals from the district court's order denying his petition for a writ of habeas corpus.

In 1999, Hargrave was convicted in Michigan state court and sentenced to eighteen to thirty years

in prison on one count of carjacking. His conviction and sentence were affirmed on direct appeal

in state court. Hargrave then filed a petition for a writ of habeas corpus in the federal district court,

raising three grounds for relief. Hargrave raises two issues here on appeal, arguing that the state trial

court violated his Sixth Amendment confrontation rights by limiting cross-examination of a witness

regarding her psychiatric condition and by limiting cross-examination regarding whether she was

using any medication. Because we conclude that the state trial court unreasonably applied Supreme

Court precedent and violated Hargrave's confrontation rights by imposing strict limits on the

_____

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of
Illinois, sitting by designation.

proposed cross-examination regarding the witness's psychiatric condition, we **REVERSE** the judgment of the district court and **GRANT** Hargrave a conditional writ of habeas corpus.

## I. BACKGROUND

By April 1999, Angela Warner ("Warner") had been living out of her car for a year and a half. At 9:30 p.m. on April 4, 1999, Warner parked in the Westridge Plaza parking lot in Westland, Michigan. Around 10:00 p.m., Warner went to sleep, lying across the front seat of her car, with the windows rolled up and the keys in the ignition.

Warner testified that at 1:00 a.m., she was awakened by the sound of knocking on the driver's side window. Hargrave asked Warner why she was sleeping in her car and requested that she go with him to get something to eat, but Warner declined. Hargrave and Warner spoke for approximately two minutes, after which Hargrave walked towards an apartment complex adjacent to the parking lot and Warner went back to sleep.

Hargrave returned at 2:00 a.m., this time approaching the passenger-side window. Hargrave and Warner again spoke briefly. Warner testified that Hargrave was "more pushy" this second time. Joint Appendix ("J.A.") at 323 (Warner Test.). Hargrave walked around to the driver-side window, Warner rolled the window down slightly, and Hargrave continued to press Warner to get something to eat with him. Warner again declined, rolled the window back up, and lay down to go to sleep.

Warner testified that Hargrave then dove through the driver-side window, shattering the window and landing on top of Warner. Hargrave asked where the keys were; Warner told him that they were in the ignition and screamed, asking Hargrave not to hurt her. After a few moments, Hargrave moved himself behind the wheel, and Warner sat up on the passenger side. Hargrave slowly drove the car to another location in the parking lot, further away from the adjacent apartment

2

complex. Hargrave began to try to remove Warner's clothes, but quickly decided to move the car again.

Hargrave slowly drove the car to a second new location in the parking lot, this time behind a store. Warner testified that she reached for the passenger door to exit the car, but Hargrave grabbed her hand and threatened to break her hand if she tried to leave again. They heard voices coming from the apartment complex, and Hargrave moved the car once again. After they moved to a location behind another store, Hargrave told Warner that he had just bought a house and asked Warner if she had any children. Warner said she did not. Hargrave said he had many children, then showed Warner his identification card.

Warner testified that Hargrave "kept talking about having [Warner] come and live with him. That he wanted [Warner] to have his baby." J.A. at 350-51 (Warner Test.). Hargrave again started removing Warner's clothes. Warner objected, but Hargrave held her down while removing her clothes and raped her. Afterwards, Hargrave suggested, "Why don't we get dressed now. We'll go to Meijer's for some cigarettes." J.A. at 355 (Warner Test.). They both exited the car and began putting on their clothes, but Hargrave then pushed Warner up against the back of the car. Hargrave pulled Warner's hair and pressed his mouth against her neck, leaving a mark on her neck, and raped her again. They both got dressed and returned to the car.

Hargrave drove the car to a location in the parking lot near where Warner had originally parked. Hargrave asked Warner, "Could you hand me my beer over there?" and directed Warner to a bottle in the grass near where they had stopped. J.A. at 360 (Warner Test.). Warner retrieved the bottle of beer, brought it back to the car, then slammed the passenger door shut and ran towards the apartment complex. Warner saw a group of people on a balcony and yelled for help.

3

Approximately ten minutes later, the police arrived. Warner and the police returned to the parking lot, where she described what had happened and walked through the three or four stops that Hargrave had made. Warner was able to tell the police the name of her assailant, based on the identification card that Hargrave had shown her. Afterwards, Warner was transported to the hospital, where she was treated for a laceration to the perineum.

At approximately 5:00 a.m., Hargrave arrived at his mother's house in Detroit, Michigan, driving Warner's car. Two Detroit police officers were waiting and arrested Hargrave as he walked from the vehicle to the house. Thereafter, Hargrave was read his *Miranda* rights and was questioned by Westland police officer Michael Terry. Hargrave admitted having sex with Warner, but claimed that she consented. Hargrave stated that he did not know how the window was broken, "[b]ut I cut my knees on the broken glass on the seat. And maybe that's how she got her vagina cut." J.A. at 440 (Terry Test.). Hargrave asserted that, after they had sex, Warner "started walking to the [apartment complex]. And I took her car to go and get some weed. I drove to my mother's house in Detroit and parked the car down the street. The next thing I knew the police came and arrested me. I did not rape her." J.A. at 439-40 (Terry Test.).

Hargrave was charged in Michigan state court with one count of criminal sexual conduct in the first degree and one count of carjacking. On the first day of trial, the prosecutor made an oral motion in limine to bar Hargrave from questioning Warner regarding her psychiatric history. Hargrave's attorney, Melinda Cameron ("Cameron"), argued that Warner was a paranoid schizophrenic and was potentially delusional at the time of the alleged offenses. Cameron argued to the state trial court that Warner jumped out of a window in August 1999, under the belief that her neighbors were going to rape and torture her. Cameron pointed to petitions filed in the state probate court by Warner's father in November and December 1997, January 1998, and August 1999—the

last filed in the days after Warner jumped out of a window—as well as a petition to terminate guardianship filed by Warner herself, arguing that information in those petitions demonstrated that Warner was a paranoid schizophrenic since childhood and that Warner's August 1999 delusions were, therefore, not isolated occurrences. Finally, Cameron noted Warner's journal entries from late March 1999, one week before the alleged offenses, in which Warner described delusions about the police.

The state trial court barred Hargrave from questioning Warner about the August 1999 incident, reasoning that "[a]n incident that occurs after she was allegedly raped by the defendant has absolutely no bearing in this court whatsoever." J.A. at 294. The state trial court also excluded mention of Warner's journal entries, concluding that they were not relevant. Finally, the state trial court excluded reference to Warner's psychiatric condition except via an admission on the stand from Warner:

> THE COURT: Counselor, the references that you made relative to the defendant being a paranoid schizophrenic, unless there is a psychiatrist who treated her, who is going to come in and say that, it will not come in, or unless you get it from her own mouth.
> Reference to her requesting to have a guardianship terminated will not come in.
> Am I clear?
> MS. CAMERON: Okay.
> So, the Court's ruling is that I can inquire whether she's been diagnosed as a paranoid schizophrenic?
> THE COURT: Absolutely.
> MS. CAMERON: Okay.
> THE COURT: Absolutely.

J.A. at 300. The next day, Cameron again raised her argument that Warner's father's August 1999 petition was relevant, as it contained documentation of Warner's August 1999 hospitalization after jumping out of a window and described delusions similar to her allegations against Hargrave. The

5

state trial court refused to alter its ruling, concluding that the August 1999 petition was filed too long after the alleged April 1999 offenses to be of any relevance.

A jury found Hargrave not guilty of first-degree criminal sexual conduct, but convicted him of carjacking. Hargrave was sentenced to eighteen to thirty years in prison. Hargrave appealed through counsel, arguing that there was insufficient evidence of force or coercion to support his carjacking conviction, that the trial court erred by preventing counsel from cross-examining Warner regarding the August 1999 petition and her psychiatric condition, and that Hargrave's sentence was disproportionate to the offense, in violation of state law. Hargrave also filed a pro se supplemental brief, raising two additional claims of error. On December 4, 2001, the Michigan Court of Appeals affirmed Hargrave's conviction and sentence, addressing only the three claims raised by counsel. *People v. Hargrave*, No. 224826, 2001 WL 1545683 (Mich. Ct. App. Dec. 4, 2001). On March 15, 2002, the Michigan Court of Appeals vacated its decision and issued a new opinion, again affirming Hargrave's conviction and sentence but this time addressing all five claims raised. *People v. Hargrave (Hargrave II)*, No. 224826, 2002 WL 410160 (Mich. Ct. App. Mar. 15, 2002). On October 29, 2002, the Michigan Supreme Court denied Hargrave's delayed application for leave to appeal. *People v. Hargrave*, 653 N.W.2d 410 (Mich. 2002).

On January 24, 2003, Hargrave filed a pro se petition for a writ of habeas corpus in the federal district court, raising the three claims presented by counsel to the Michigan Court of Appeals. On March 23, 2005, the district court denied Hargrave's petition, and on April 25, 2005, the district court granted Hargrave a certificate of appealability on all three claims. On April 25, 2006, after reviewing Hargrave's pro se brief on appeal, we directed the clerk to appoint counsel for Hargrave. *Hargrave v. McKee*, No. 05-1536 (6th Cir. Apr. 25, 2006) (unpublished order).

## II. ANALYSIS

On appeal, Hargrave argues that the state trial court violated Hargrave's Sixth Amendment confrontation rights by limiting cross-examination of Warner regarding her psychiatric condition.[1]

### A. The Issue Presented on Appeal

The state first argues that the issue presented by Hargrave is not properly before us on appeal, at least not in full. The state characterizes the issue presented by Hargrave to the Michigan state courts and to the federal district court as "his claim that he should have been allowed to question the victim regarding the [August 1999] probate petition." Appellee's Br. at 12. The state argues that Hargrave is "attempt[ing] to expand the claim to contend that the trial court disallowed any cross-examination regarding Ms. Warner's psychiatric condition." *Id.* According to the state, the confrontation issue was exhausted in the state courts only with respect to questioning related to the August 1999 petition, not Warner's psychiatric condition in general, and only this narrow issue is properly before us via the district court's certificate of appealability.

We reject the state's narrow, cramped characterization of the issues raised by Hargrave. We have stated:

> When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.

---

[1]Hargrave also argues that the state trial court violated Hargrave's Sixth Amendment confrontation rights by barring Hargrave from asking Warner whether she was using any medication when she testified. The state argues that Hargrave has not been issued a certificate of appealability on this issue. Because we grant Hargrave habeas relief on other grounds, we decline to address this issue.

7

*Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001). However, in his brief filed in the Michigan Court of Appeals, Hargrave raised a broader claim than that recognized by the state. Hargrave first summarized the state trial court's rulings, noting the presentation of not only the August 1999 petition, but also the 1997 petitions, the delusions described in Warner's journal, and defense counsel's argument "that she should be able to inquire into Ms. Warner's psychiatric condition in order to establish whether she was operating under delusions when she alleged that she had been raped." J.A. at 101-02 (Hargrave Mich. Ct. App. Br. at 22-23). Hargrave asserted that the state trial court's ultimate ruling "denied [Hargrave] the opportunity to present to the jury evidence through cross-examination that would show that Ms. Warner suffered from a mental illness such that her recollection of some of the events which occurred during the offense may be the result of psychiatric delusions." J.A. at 102 (Hargrave Mich. Ct. App. Br. at 23). Following his analysis of relevant caselaw in support of his argument, Hargrave requested "a new trial in which he is allowed to cross-examine Ms. Warner on her psychiatric condition." J.A. at 104 (Hargrave Mich. Ct. App. Br. at 25). Although Hargrave's argument focused on the state trial court's refusal to allow any questioning specifically related to the August 1999 petition, even the petition itself discusses Warner's ongoing psychiatric condition in general. Accordingly, we conclude that Hargrave fairly presented to the Michigan state courts the general issue of cross-examination of Warner regarding her psychiatric condition.

Likewise, we conclude that the district court granted Hargrave a certificate of appealability for this more general claim. The state is correct that we may review only issues for which a certificate of appealability has been granted. *See* 28 U.S.C. § 2253(c). In this case, the district court certified for appeal the following issue:

Whether Petitioner is entitled to habeas relief because he was denied a fair trial by the trial court's ruling on the exclusion of the August 1999 probate petition filed by the victim's father, which precluded Petitioner's trial counsel from cross examining the victim concerning the probate petition and her psychiatric condition?

J.A. at 285 (Dist. Ct. COA at 2). Like Hargrave's brief to the Michigan Court of Appeals, the district court's certificate of appealability decision raised the August 1999 petition specifically and Warner's psychiatric condition generally. Accordingly, we conclude that Hargrave's general argument that the state trial court unconstitutionally limited cross-examination of Warner regarding her ongoing psychiatric condition, presented via the specific psychiatric information contained in the August 1999 petition, is properly before us on appeal.

**B. Standard of Review**

We review de novo a district court's decision in a habeas proceeding. *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005). We review a district court's factual findings for clear error. *Id.* The familiar standard for analyzing a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is set forth in 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has further clarified the meaning of § 2254(d):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Terry Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

The AEDPA standard of review, however, applies only to habeas claims that are "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003). When a habeas claim is not adjudicated in state court, we apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact. *Maples*, 340 F.3d at 436. When the state court decides a habeas claim but does not articulate its reasoning, *see Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001), and when "the state court decision does not squarely address the federal constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis," *Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006); *see also Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006); *Maldonado v. Wilson*, 416 F.3d 470, 475-76 (6th Cir. 2005), *cert. denied*, --- U.S. ---, 126 S. Ct. 1038 (2006), we apply a modified form of AEDPA review. The modified AEDPA standard of review developed in this circuit requires us "to conduct a careful review of the record and applicable law, but nonetheless bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Maldonado*, 416 F.3d at 476; *see also Harris*, 212 F.3d at 943 (characterizing the modified AEDPA standard as requiring us "to conduct an independent review of the record and applicable law").

Despite the fact that Hargrave argued to the Michigan Court of Appeals that the state trial court's rulings violated both Michigan law and the Confrontation Clause, the Michigan Court of Appeals decided only that the state trial court did not err under Michigan evidence law. Our prior

10

decisions do not clearly dictate whether to apply the pre-AEDPA standard of review or the modified AEDPA standard in this situation. In some ways, the discussion by the Michigan Court of Appeals regarding whether the state trial court abused its discretion by limiting cross-examination is similar to the relevant constitutional inquiry: whether the state trial court violated the Confrontation Clause's guarantee of an opportunity for effective cross-examination, *see Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). We have also stated, however, that de novo review applies in a situation quite similar to the case at hand: when "the highest state court found that the trial court did not err, under state evidence law, in admitting the challenged evidence" but "did not address the due process aspects of the challenge." *Maldonado*, 416 F.3d at 476. Because we conclude that Hargrave is entitled to habeas relief under either standard, we decline to resolve this issue and thus apply for purposes of this case the more exacting modified AEDPA standard of review in our analysis.

## C. Cross-Examination Regarding Warner's Psychiatric Condition

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (internal quotation marks omitted). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 315. In cases, such as this one, "involving trial court restrictions on the scope of cross-examination, the [Supreme] Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively . . . emasculate the right of cross-examination itself.'" *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985) (alteration in original) (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

The state first argues that the decision of the Michigan Court of Appeals cannot have been contrary to or an unreasonable application of Supreme Court precedent because "the Supreme Court has never held that cross examination with regard to general credibility, as opposed to bias, is

11

constitutionally protected." Appellee's Br. at 15; *see also Hargrave II*, 2002 WL 410160, at *1 ("Even if the proferred cross-examination had some relevancy, at best it was relevant only to a collateral matter in connection with the victim's general credibility."). In *Davis v. Alaska*, the Supreme Court repeated the long-established general rule that "the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." *Davis*, 415 U.S. at 316. The state is correct that the Supreme Court has never addressed directly a situation in which a defendant sought to cross-examine a witness regarding the witness's psychiatric condition, but "[t]hat the standard is stated in general terms does not mean the application was reasonable. AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, --- U.S. ---, 127 S. Ct. 2842, 2858 (2007) (internal quotation marks omitted). *Davis* requires that a defendant be allowed to test a witness's perceptions and memory via *indirect* means, such as flaws in the witness's story or impeachment evidence, and Hargrave sought to attack *directly* Warner's perceptions and memory of the very events at issue, arguing that her ongoing psychiatric condition, including delusions in many ways similar to the allegations for which Hargrave was being prosecuted, called into question her account of events. Moreover, Warner's state of mind at the time of the events in question was at issue, as Hargrave could not be convicted under the carjacking statute if Warner consented to Hargrave temporarily taking her car.[2] *See* MICH. COMP. LAWS § 750.529a. Accordingly, we reject

---

[2]The Michigan Court of Appeals stated that "it was not claimed that [Warner] was delusional about defendant acquiring possession of her vehicle." *Hargrave II*, 2002 WL 410160, at *1. Hargrave did argue, however, that Warner consented, and if Hargrave had Warner's consent, his taking possession of the vehicle did not constitute carjacking. *See* MICH. COMP. LAWS § 750.529a.

the state's argument that Hargrave's proposed cross-examination did not implicate Confrontation Clause concerns.

Our decision in *Boggs v. Collins*, 226 F.3d 728 (6th Cir. 2000), *cert. denied*, 532 U.S. 913 (2001), does not vindicate the state's position. In *Boggs*, we interpreted two Supreme Court decisions, *Davis v. Alaska*, 415 U.S. 308, and *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), as setting forth a rule "that cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not." *Boggs*, 226 F.3d at 737. However, even if we were to accept our statement in *Boggs* as binding—a proposition on which we have recently cast considerable doubt, *see Vasquez v. Jones*, --- F.3d ---, 2007 WL 2176985, at *6 (6th Cir. July 24, 2007) (noting that *Boggs* addressed the special context of application of a rape-shield statute and concluding that "*Boggs* is better seen as a case about the court's broad discretion to limit the scope of cross-examination to prevent undue harassment and the like")—we would have no difficulty concluding that the Confrontation Clause guaranteed Hargrave the right to cross-examine Warner, the sole eyewitness against him, regarding Warner's possible delusions or other mental limitations affecting her ability accurately to perceive and recall the events at issue. Unlike a general attack on credibility, Hargrave's proposed cross-examination did not seek merely to demonstrate that Warner's past behavior indicated that she might be a person who was more willing to lie under oath than the average person. Rather, Hargrave's proposed cross-examination, if successful, raised a strong possibility that Warner's psychiatric condition rendered her testimony unreliable regarding the very events at issue and, accordingly, was more similar to the possibility of unreliability raised by questions of motive or bias than to that raised by questions of general character for truthfulness.

13

The state also argues that "the trial court did not entirely prohibit evidence regarding [Warner's] psychiatric condition," Appellee's Br. at 16, bringing the real issue before us into focus: whether the state trial court's limits on Hargrave's proposed cross-examination amounted to an unreasonable application of Supreme Court precedent interpreting the Confrontation Clause. "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. At the same time, "where, as here, the Government's case may stand or fall on the jury's belief or disbelief of one witness, h[er] credibility is subject to close scrutiny." *Gordon v. United States*, 344 U.S. 414, 417 (1953).

The state argues that the state trial court did not violate Hargrave's confrontation rights because it permitted him to "inquire whether [Warner was] diagnosed as a paranoid schizophrenic." J.A. at 300 (Trial Tr. at 16). The Supreme Court, however, has rejected the argument that such strict limitations on cross-examination are permissible under the Confrontation Clause. In *Davis*, the Court noted that "counsel was permitted to ask [the witness] whether he was biased," *Davis*, 415 U.S. at 318, essentially the same limited inquiry that Hargrave was permitted. The Court concluded that "to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* Any reasonable application of *Davis* to the case before us would similarly permit Hargrave to develop, via cross-examination, facts

14

through which the jurors could adequately judge Warner's reliability. As in *Davis*, "[o]n the basis of the limited cross-examination that was permitted [to Hargrave], the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Id.*

To be clear, we do not mean to suggest that Hargrave was constitutionally entitled to cross-examine Warner in whatever manner he wished regarding any and all recorded incidents, delusions, or psychiatric evidence. The state trial court had broad discretion to limit, for example, the particular details that Hargrave exposed on cross-examination, in order to prevent harassment, prejudice, or confusion. *See, e.g.*, *Van Arsdall*, 475 U.S. at 679. We conclude, however, that the state trial court's decision limiting Hargrave solely to the question of whether Warner had been diagnosed as a paranoid schizophrenic was an unreasonable application of Supreme Court precedent and violated Hargrave's rights under the Confrontation Clause.

## D. Harmless Error

Unconstitutional limitations on cross-examination are normally subject to harmless-error analysis. *See id.* at 681-84. However, the state has waived any argument that the state trial court's decision was harmless error. The state's brief on appeal includes a fact sheet with a box checked indicating that the state was not arguing that any constitutional violation was found harmless, *see* Appellee's Br. at ii, and the state did not argue elsewhere in its brief that the state trial court's decision was harmless error. "Even appellees waive arguments by failing to brief them," *United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000), and, accordingly, the state has waived any harmless-error argument.

At oral argument, counsel for the state made some arguments that could be construed as asserting that the state trial court's decision was harmless error. Even if we were to conclude that

15

the state had not waived the argument, however, we would conclude that the state trial court's decision was not harmless. The Supreme Court has recently made clear "that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness." *Fry v. Pliler*, --- U.S. ---, 127 S. Ct. 2321, 2328 (2007). We consider a number of factors in deciding whether unconstitutional limitations on cross-examination were harmless, "includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684; *see also Vasquez*, 2007 WL 2176985, at *7.

Warner's testimony was integral to the prosecution's case, as she was the only eyewitness to the alleged crimes and was the only witness who could provide any testimony regarding two necessary elements of the crime of carjacking: whether Hargrave's taking of her car was a "larceny"; and whether he used "force or violence," "the threat of force or violence," or "put[] [Warner] in fear," MICH. COMP. LAWS § 750.529a. The broken window provided circumstantial corroborating evidence that force was used to take the car, but only Warner's testimony indicated that Hargrave was responsible for breaking the window, and Hargrave's own statement contradicted Warner's.[3] Aside from Warner's testimony, the prosecution's case was based on second-hand

---

[3]Hargrave's acquittal on the rape charge demonstrates that the jury already harbored substantial doubts as to Warner's credibility. Thus, it is all the more critical that the jury was deprived of highly probative evidence as to Warner's mental instability and delusional tendencies—both before and after the alleged offenses—that could have created more than a

accounts and scattered pieces of circumstantial evidence. Finally, the proposed cross-examination was in no way cumulative, as Warner's psychiatric condition had not otherwise been presented to the jury, and no other permitted cross-examination similarly tested the reliability of Warner's perceptions and memory. In sum, the factors listed in *Van Arsdall* point strongly towards our conclusion that the state trial court's decision limiting cross-examination had a substantial and injurious effect on the jury's verdict. Accordingly, Hargrave is entitled to habeas relief.

### III. CONCLUSION

Because the state trial court unreasonably applied Supreme Court precedent and violated Hargrave's confrontation rights by imposing strict limits on the proposed cross-examination regarding Warner's psychiatric condition, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions that the district court order that Hargrave be released from state custody unless the State of Michigan commences a new trial within 180 days of the final federal-court judgment in this case.

---

reasonable doubt as to the carjacking charge as well.

**Martha Craig Daughtrey,** dissenting. Although I acknowledge that the legal analysis contained in the majority opinion is appropriate, I am not persuaded that the application of that analysis to the facts in this case necessarily leads to the conclusion that the petitioner is entitled to habeas relief. For this reason, I most respectfully dissent.

In order to circumvent the holding in *Boggs v. Collins*, 226 F.3d 728, 737 (6th Cir. 2000) ("cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not"), the majority concludes that the proposed cross-examination at issue in this case would have "raised a strong possibility that Warner's psychiatric condition rendered her testimony unreliable regarding the very events at issue and, accordingly, was more similar to . . . questions of motive or bias than to . . . questions of general character for truthfulness." Maj. Op. at 15. Accepting this analysis at face value, however, I am unable to see how further interrogation concerning the victim's psychiatric condition would have rendered unreliable her testimony regarding the events surrounding the *car-jacking* charge, as opposed to the rape charge, in light of the evidence in the record.

As the district court found, that evidence was sufficient to allow a rational trier of fact to find that the prosecution established beyond a reasonable doubt that Hargrave committed the offense of car-jacking as defined by state law, when measured by the applicable federal constitutional standard required by *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Michigan car-jacking statute requires proof that the defendant (1) took a motor vehicle from another person, (2) in the presence of that person, a passenger, or anyone in lawful possession of the vehicle, (3) by force or violence, by threat of force or violence, or by putting the other person in fear. *See* M.C.L.A. 750.529a(1). If there were no other evidence than Warner's testimony that Hargrave took a car from her by force,

18

the reliability of her testimony could conceivably have been challenged successfully on the basis of a history of mental illness: Did she actually have a car and was it taken from her without consent, or was she suffering from hallucinations at the time of the alleged offense? Was the defendant actually the person who took it, or was he somehow misidentified because the victim was gripped by delusion?

The record as to the car-jacking, however, is not reasonably subject to such a challenge. Warner testified that she did not relinquish possession of the car voluntarily. The evidence showed that Warner was living in her car, a situation giving rise to a reasonable inference that she would not willingly consent to have the car taken from her. Warner described how Hargrave broke out the window of her automobile and landed inside the car on top of her. In fact, the window had been broken, and evidence of the manner in which it came to be broken was fully consistent with Warner's testimony. In addition, the proof showed that Hargrave sustained cuts from the broken glass. Once he had subdued the victim and gained control of the keys, he moved the automobile several times with Warner in it. After she fled screaming from the car – screaming that was heard by people in the area – Hargrave drove off in the automobile and still had possession of it at the time of his arrest. Given the evidence in the record extraneous to Warner's testimony, and given what the jury did know about her mental condition (which was apparently enough to provide a basis for acquitting the defendant on the rape charge), it is difficult to see how cross-examination concerning the contents of the probate petition would have added anything to the jury's understanding of the facts or otherwise affected the outcome of the trial.

As the district court noted, citing *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994), questions concerning the admission or exclusion of evidence are matters of state law and are not

19

reviewable in a federal habeas proceeding unless the asserted error infringed upon a specific constitutional right or was so prejudicial as to deny due process. In *Clemmons*, we also held that even if a rule of evidence were violated, relief in a collateral action is appropriate only if "the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Hence, to obtain habeas relief on this basis, a petitioner must show actual prejudice. *Id.* at 357-58. Whether the proposed cross-examination in this instance is seen as relevant to the witness's credibility (as the Michigan Court of Appeals and the district court found) or to her reliability (as the majority here proposes), there simply is no basis upon which to conclude that the petitioner established actual prejudice sufficient to constitute a constitutional violation requiring retrial.

For this reason, I would affirm the decision of the district court denying habeas relief.