**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 27, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SEAN PAUL BAKER,

    Defendant - Appellant.

No. 24-7017

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 6:22-CR-00034-RAW-1)**
_____

Carl R. Hennies, Assistant Federal Public Defender (Maureen Scott Franco, Federal Public Defender, with him on the briefs), Western District of Texas, San Antonio, Texas, for Defendant-Appellant.

Lisa C. Williams, Special Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **BACHARACH**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

**BALDOCK**, Circuit Judge.
_____

A jury convicted Defendant Sean Paul Baker, an Indian, on one count of aggravated sexual abuse in Indian Country, in violation of 18 U.S.C. §§ 2241(c) & 2246(2)(B) (contact between the perpetrator's mouth and the vulva of a victim under the age of twelve), one

count of aggravated sexual abuse in Indian Country, in violation of 18 U.S.C. §§ 2241(c) & 2246(2)(C) (penetration of the anal or genital opening of a victim under the age of twelve by the perpetrator's hand or finger), and one count of sexual abuse of a minor in Indian Country, in violation of 18 U.S.C. §§ 2243(a) & 2246(2)(D) (intentional direct touching of the genitalia of a victim under the age of sixteen by the perpetrator). The district court sentenced Defendant to 420 months' imprisonment on the first two counts and a concurrent term of 180 months' imprisonment on the third count.

Defendant now appeals his convictions, claiming evidentiary error entitles him to a new trial. Our jurisdiction arises under 28 U.S.C. § 1291. The determinative issue on appeal is whether the district court erred when it granted the Government's motion in limine under Federal Rule of Evidence 412 to exclude from trial any mention of or attempt to introduce four fictionalized, sexually suggestive YouTube videos created by D.P., the child victim, when she was around the age of eleven. Rule 412, commonly known as the federal "rape-shield" rule, provides in relevant part that in a sexual abuse prosecution, "evidence offered to prove that a victim engaged in other sexual behavior; or . . . to prove a victim's sexual predisposition" is inadmissible. Fed. R. Evid. 412(a). Applying the governing law to the record before us, we conclude the district court properly excluded the evidence, and affirm.

I.

On direct examination, D.P. testified that "not very good things" would happen when she was alone with Defendant, who at the time was married to D.P.'s mother. The abuse began when D.P. was around the age of six and continued until she was over the age

2

of twelve, with a pause around the age of eight because her "mom was home more." Defendant began abusing D.P. by having her fondle his penis. Over time, Defendant began to touch and rub his penis on D.P.'s vagina and anus. Defendant also would place his mouth on D.P.'s vagina.

> Q. How many times would Big Sean [*i.e.*, Defendant] have you touch his penis with your hands?
> A. Too many to count.
> Q. How many times would Big Sean use his mouth to touch your vagina?
> A. Too many to count.
> Q. How many times would Big Sean use his hands to touch your naked body?
> A. Too many to count.

According to D.P., the abuse occurred mainly in the bedroom shared by D.P.'s mother and Defendant. "Almost every time," Defendant would instruct D.P. not to tell anyone what had happened.

When twelve years old, D.P. ended up in the hospital after she tried to kill herself by swallowing an excessive amount of prescribed anti-depressant medication. D.P.'s mother, Stevie Baker, agreed to place D.P. on anti-depressant as well as anti-anxiety medications after she noticed a downward swing in D.P.'s mood around the age of nine. D.P testified she tried to overdose because "[i]f I was gone, I wouldn't have to talk about anything" Defendant did. D.P. recalled "little bits" of being in the hospital, "but really it was just hallucination." D.P. explained "[t]here was a closet that was breathing and spiders crawling from behind it and there was also two kids riding Godzilla." D.P. said she "controlled the spiders, little ants, all sorts of stuff," and "[i]t was actually pretty fun until I couldn't control them."

3

D.P. did not recall telling anyone about the abuse while in the hospital. D.P.'s mother testified, however, that while she and the emergency room doctor were with D.P., the doctor asked D.P. why she tried to harm herself. As she began to weep, D.P. told them that Defendant "was touching her and she wanted it to stop." The next day, D.P. told a Sexual Assault Nurse Examiner that she had been in the emergency room for an attempted suicide. Again becoming upset, D.P. said "her stepfather had been touching her for quite some time and that had really been bothering her." D.P. told the nurse that Defendant had been touching "her private area," and only two weeks had passed since he last sexually assaulted her. A subsequent physical exam of D.P. revealed no abnormal findings.

No one disputes that given the absence of physical evidence, the outcome of the Government's case against Defendant rested on the veracity of D.P.'s sexual abuse allegations. Accordingly, in cross examining D.P. and other witnesses, Defendant focused on attacking D.P.'s credibility. D.P. admitted that she had been on anti-depressant and anti-anxiety medications "[f]or a while," and hallucinated for three days after arriving at the hospital. Defendant asked D.P. why she did not tell her mother about the abuse sooner. D.P. said she was scared to tell anyone because Defendant "was an alcoholic and had very bad anger issues." D.P. also acknowledged never telling any of her family members about the abuse prior to her attempted suicide. When asked if she told anyone at school, D.P. replied, "I gave hints that something was happening, but no one caught on, so. . . . I don't remember exactly what I said or exactly what I'd do, but I gave off hints." In particular, D.P. said she gave hints to her "ex" boyfriend, J.F.

4

Defendant asked D.P. about a "journal" containing "sexual content:" "You would write sexual content into a journal that your mom [apparently found and] asked you about." D.P. responded "no" and explained that "it wasn't a journal. It was just a piece of paper." Defendant also asked D.P. about "a lot of videos" she posted online on YouTube. The district court overruled the Government's objection to the question after Defendant explained he was inquiring about D.P.'s social media use in general and not any particular videos. D.P. acknowledged she had a "YouTube page," but made no mention of the four videos the court had earlier excluded from evidence. D.P. answered that in the past she had posted "Gacha" videos on YouTube, describing them as "animated videos of a gang that [are] free to anyone to have." She also stated she had posted videos of herself and her siblings together. Defendant then inquired about D.P.'s interest in "anime," a style of animation originating in Japan. D.P. said she liked anime "100 percent." Defendant next posed the following question to D.P. in front of the jury: "Now since you love anime a hundred percent, you know that anime sometimes is sexual in nature, right?" But D.P. did not have an opportunity to answer before the Government objected. The court sustained the objection and precluded D.P. from answering on the basis of Rule 412.

Defendant also broached the topic of suggestibility with other Government witnesses. The testimony of Tyler Sands, an investigator assigned to the case, stands out.[1]

---

[1] As part of his investigation, Investigator Sands interviewed Defendant. Sands testified that Defendant recalled being involved in a "ticklish match" with D.P. when she was around six or seven years old. D.P. testified this "ticklish match" led to the first incident of sexual abuse. According to Sands, Defendant confirmed he was left alone frequently with D.P. and this made him "feel uncomfortable." Sands further testified that Defendant, while not admitting to any sexual abuse, told him he regretted

Sands acknowledged that "children are subject to suggestibility," and that "suggestibility can create memory distortion or error" or "in some cases, cause false outcries." Sands further acknowledged that anime sometimes "can be suggestive and sexual." Referring to D.P.'s behavior, Defendant asked Sands: "[K]nowing that anime can be sexual in nature, . . . it didn't occur to you that there might be a link between locking yourself in a room with anime and later sexual accusations?" Sands ambiguously answered "yes." Defendant also raised with Sands the fact that D.P.'s mother testified about dreaming Defendant was sexually abusing D.P. and "multiple times ask[ed] D.P. if she was ever being inappropriately touched by anyone." After pointing out that D.P. was on "multiple powerful medications" when she first reported the sexual abuse, Defendant continued his attack on D.P.'s veracity with the following question:

> Now, as an investigator trying to figure out whether or not this thing happened, did it occur to you that having a preteen mind on powerful drugs, being told by her mother she's having bad dreams about the stepdad and D.P., and on top of [that] being asked over and over if anyone is inappropriately touching [her], did it ever occur to you that [this] creates an environment rife with possible suggestibility?

Sands answered: "It's a possibility."

Continuing his attack on D.P's credibility, Defendant concluded his cross-examination of Sands with questions about the manifestation of preteen "attention-seeking behavior" "through the posting of videos on social media." Defendant pointed out that "although I can't call her a YouTuber, D.P. does have YouTube videos out there." Sands

---

"how far things went" with D.P. What stood out to Sands during the interview were Defendant's statements that "[t]here [were] times . . . he had felt regret for what he had done and that . . . she had come on to him."

acknowledged this was the first he had heard of any YouTube videos and admitted that "depending on what those videos portrayed," the conclusions he reached as a result of his investigation into D.P.'s sexual abuse allegations "could change."

Defendant's case-in-chief consisted of one expert witness. Dr. Aaron Pierce, a forensic psychologist, testified about false allegations of sexual abuse. Pierce testified that "not all allegations of sexual abuse are true." He opined that between 6 and 36 percent of sexual abuse allegations are false and that certain indicators may be associated with such allegations. When asked why somebody would make false accusations of sexual abuse, Pierce answered: "There's research that talks about motive and some of those include seeking attention and trying to change [one's] environment." In some cases, the accuser might be seeking revenge for past events. Pierce also believed an accuser's mental condition or state may be a factor contributing to false accusations of sexual abuse.

## II.

With the preceding trial summary in mind, we now turn to Defendant's appeal. In his opening brief, Defendant acknowledges what is obvious from our reading of the trial transcript, namely that "the [G]overnment's case hinged on D.P.'s credibility," and his "defense was that D.P. made up her allegations." To strengthen his case that D.P. was prone to suggestibility and had a propensity to sexual fantasy, Defendant sought to introduce into evidence and raise questions about the four YouTube videos D.P. posted online. Defendant does not argue the videos are divisible, *i.e.,* admissible in part, so we treat them as an indivisible unit.

7

Although at times difficult to understand due to poor audio quality, the first three videos, in which D.P. faces the camera, appear to tell the fictionalized tale of a boy and a girl. In the first video, posted on YouTube in February 2021, D.P. tells the viewers she "made up" the story. The boy and girl meet and the girl tells the boy she likes him. In the second video, posted the next day, D.P.'s story picks up with the boy and girl falling asleep together after kissing and saying they love each other. The story ends with the third video, posted the same day as the second. D.P. says the girl is waiting for the boy when he comes home drunk. The boy pulls the girl onto his lap and says, "if you move you will wake it up." The girl moves and the boy moans. The boy tells the girl "you asked for it," pins her to the couch, and begins kissing her. They wake up naked the next morning together and the boy promises never to drink again.

The fourth video, posted four months later in June 2021, appears unrelated to the other three videos. This video depicts imaginary text message conversations. A girl has a crush on a boy and invites him to her bedroom. He shuts the door and they kiss. D.P. writes the two "made out and had a really good night." The girl asks the boy "how was it" and the boy replies "it was good." The girl tells the boy she hopes no one heard him because he was "really nois[y]," but she didn't care because that meant he "liked it." The boy tells the girl he can't walk and needs a wheelchair. The girl then confronts a jealous female friend and tells her she was "the one making him happy in bed." The girl tells her friend "you will find someone just keep looking."

The district court disallowed any discussion or presentation of the YouTube videos before the jury pursuant to Federal Rule of Evidence 412. Subsections (a) and (b) of Rule 412 as they apply to criminal proceedings read in their entirety:

> **(a) Prohibited Uses.** The following evidence in not admissible in a . . . criminal proceeding involving alleged sexual misconduct:
>> **(1)** evidence offered to prove that a victim engaged in other sexual behavior; or
>> **(2)** evidence offered to prove a victim's sexual predisposition.
>
> **(b) Exceptions**.
>> **(1) Criminal Cases.** The court may admit the following evidence in a criminal case:
>>> **(A)** evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;
>>> **(B)** evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and
>>> **(C)** evidence whose exclusion would violate the defendant's constitutional rights.

On appeal, Defendant's arguments for the admissibility of the videos are substantially the same as those the district court rejected. Defendant argues Rule 412 does not apply in this instance because he did not offer the videos "to prove" D.P.'s "other sexual behavior," or "sexual predisposition" as required by subsection (a), but instead offered the videos to impeach D.P.'s credibility by showing the jury she was capable of making up sex-related stories. According to Defendant, because D.P. was capable of imagining the sexual escapades she described in the YouTube videos, D.P. was capable of imagining other escapades in the form of the sexual abuse allegations against Defendant. In the alternative, Defendant says that even assuming the terms of Rule 412 apply, exclusion of

9

the video evidence violated his Fifth Amendment right to due process and his Sixth Amendment right to confront witnesses against him.[2]  *See* U.S. Const. amend. V & VI. According to Defendant, the videos have "significant probative value to explain D.P.'s credibility as a witness" and their admission into evidence was necessary to counter the Government's argument to the jury that D.P.'s testimony was truthful and not "made up." While we generally review a district court's evidentiary decisions only for an abuse of discretion, a legal error such as a district court's application of an inapplicable rule of evidence constitutes an abuse of discretion.  *United States v. A.S.*, 939 F.3d 1063, 1070–71 (10th Cir. 2019).  To the extent the exclusion of evidence is said to violate the Constitution, our review is de novo.  *Id.* at 1071.

### A.

Because all questions of legislative construction begin with the language of the law itself, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002), we begin our analysis of Defendant's first argument—that Rule 412, in particular subsection (a), does not apply in this instance—by relying on the dictionary definition of "predisposition."  Black's Law Dictionary defines "predisposition" as "[a] person's inclination to engage in a particular activity."  *Predisposition*, Black's Law Dictionary 1427 (12th ed. 2024) (hereinafter Black's).  In this case, the videos reveal D.P.'s inclination or propensity over a period of

---

[2] Subsection (b)(1)(C) of Rule 412 exempts from subsection (a) "evidence whose exclusion would violate the defendant's constitutional rights."  This goes without saying because regardless of subsection (b)(1)(C), subsection (a) cannot exclude evidence the exclusion of which would violate a defendant's constitutional rights.

time to engage in sexual fantasy through storytelling, both spoken and written. *See* Fed. R. Evid. 412 (Advisory Committee Notes (hereinafter "ACNs" within citations)) (evidence relating to an alleged sexual abuse victim's speech may reflect sexual predisposition).

To be sure, Rule 412's legislative history suggests the YouTube videos might be said to constitute evidence of D.P.'s "other sexual behavior" rather than her "sexual predisposition." The Advisory Committee Notes to Rule 412 tell us the word "'behavior' should be construed to include activities of the mind, such as fantasies or dreams," while "predisposition" refers to "evidence that does not directly refer to sexual activities or thoughts but that the proponent believes may have a sexual connotation for the factfinder." *See United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002) ("In the absence of a clear legislative mandate, the [ACNs] provide a reliable source of insight into the meaning of a [federal] rule[.]"). But whether the videos constitute evidence of D.P.'s "other sexual behavior" or her "sexual predisposition"—or both—within the meaning of Rule 412(a) is an academic inquiry we need not resolve because most assuredly the videos at the very least constitute evidence of one or the other.

While Defendant does not acknowledge the evidentiary nature of the YouTube videos, he says any inquiry into their nature is beside the point because Rule 412(a) does not bar evidence of an alleged victim's sexual behavior or predisposition where such evidence is offered for the *purpose* of impeaching the credibility of the victim's testimony. *See A.S.*, 939 F.3d at 1073 n.4 (declining to reach the question of whether a defendant's "purposes for seeking to admit his sex-related evidence actually implicates Rule 412"). We disagree with Defendant's argument because we find no support in the language of

11

Rule 412(a) for the proposition that its application turns on the ultimate purpose for which evidence of sexual behavior or predisposition is offered.

Subsection (a) of Rule 412 on its face constitutes a categorical bar against "evidence offered to prove" an alleged victim's "other sexual behavior" or "sexual predisposition." *See* Fed. R. Evid. 412 (ACNs) (Rule 412 bars "evidence relating to the alleged victim's sexual behavior or alleged sexual predisposition, whether offered as substantive evidence or for impeachment."). Webster's defines the term "prove" as "to establish the truth of," "demonstrate," "show." *Prove*, Webster's Third New Int'l Dictionary 1826 (1981) (capitalization omitted). Similarly, Black's defines "prove" as "to establish the truth of a fact . . . by satisfactory evidence." Black's, *supra* at 1482. To impeach D.P.'s credibility, Defendant proffered evidence of the YouTube videos to show or demonstrate, *i.e.*, "to prove," to the jury that D.P.'s propensity to sexual fantasy rendered her sexual abuse allegations against Defendant unworthy of belief. Rule 412(a), however, bars Defendant's evidence because D.P.'s impeachment with evidence showing she was prone to sexual fantasy would constitute impeachment with "evidence offered to prove" D.P.'s "other sexual behavior" or "sexual predisposition."

Subsection (b)(1) of Rule 412 provides only two exceptions to subsection (a)'s blanket exclusion that are based on the purpose for which the otherwise proscribed evidence is ultimately offered. The first exception says evidence of an alleged victim's sexual behavior is admissible "if offered [by the defendant] to prove that someone other than the defendant was the source of . . . physical evidence." Fed. R. Evid. 412(b)(1)(A). The second exception says evidence of an alleged victim's sexual behavior is admissible

12

"if offered by the defendant to prove consent[.]" *Id.* R. 412(b)(1)(B). Defendant would have us read into subsection (b)(1) a third exception to the effect that evidence of sexual behavior or predisposition is admissible if offered by the defendant to prove the alleged victim of sexual abuse was untruthful, or, in other words, to impeach the victim. But that exception is nowhere to be found in Rule 412(b)(1)—and for good reason.

Because an accuser's "credibility will *almost always* be the cornerstone of a . . . sexual assault case," *Boggs v. Collins*, 226 F.3d 728, 740 (6th Cir. 2000) (emphasis added), an exception to Rule 412(a) where otherwise proscribed evidence is offered for the purpose of impeaching the alleged victim would render evidence of a victim's sexual behavior or predisposition admissible in virtually *all* instances, in effect swallowing Rule 412(a). Our observation holds truer still where, as here, the alleged victim exhibits no signs of physical injury and the defenses of consent and mistaken identity are necessarily unavailable because the victim is a minor who was subjected to repeated instances of sexual abuse over an extended period of time.

The only case Defendant cites for the proposition that Rule 412 does not bar evidence of "other sexual behavior" or "sexual predisposition" where offered for the purpose of impeachment is the Sixth Circuit's non-binding decision in *United States v. Kettles*, 970 F.3d 637 (6th Cir. 2020). *Kettles* certainly says that a prior false accusation of sexual assault is admissible notwithstanding Rule 412 when offered to impeach the alleged victim of the charged sexual assault. *Id.* at 642–43. And *Kettles* might be read to suggest the basis for its statement resided in the purpose for which evidence of the false accusation was offered. *Id.* at 643; *contra United States v. Withorn*, 204 F.3d 790, 795 (8th

13

Cir. 2000) ("[I]mpeaching the victim's truthfulness and showing her capability to fabricate a story are not recognized exceptions to Rule 412." (internal quotations omitted)). But the better explanation, as set forth in the sole Sixth Circuit precedent upon which *Kettles* relied, is that a prior false accusation of sexual assault is admissible not because it is offered for the purpose of impeachment but because it does not constitute evidence of "other sexual behavior" or "sexual predisposition" within the meaning of Rule 412(a). *United States v. Willoughby*, 742 F.3d 229, 234 (6th Cir. 2014), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).

In such cases, "the testimony's whole predicate [is] that there [is] no 'other sexual behavior' to begin with. For the same reason, the testimony [is] not 'offered to prove [the victim's] sexual predisposition.'" *Id.* In other words, at least where a prior *false* accusation involves an *entirely* fabricated encounter, a court may justifiably conclude Rule 412 is not implicated because inquiry into the accusation will not explore the sexual behavior or predisposition of the alleged victim. *See* Rosanna Cavallaro, *Rape Shield Evidence and the Hierarchy of Impeachment*, 56 Am. Crim. L. Rev. 295, 307 (2019) (observing that where a false accusation of sexual assault is a "whole cloth fabrication," some courts have held a victim's impeachment with such accusation does not implicate the rape shield rule, but is permitted subject to the strictures of other rules of evidence such as Rules 403 and 608(b)); c*f. A.S.*, 939 F.3d at 1071 (assuming Rule 412(a) applied to a prior *unproven* accusation of sexual assault).

When all else fails, Defendant turns to the purpose underlying Rule 412's enactment to argue we should not apply it in this instance. This purpose is not only to "encourage[]"

14

victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders," but also "to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." Fed. R. Evid. 412 (ACNs).  Defendant points out that D.P. posted the videos on YouTube, a public forum, so here the privacy interest behind Rule 412 is imperfectly served.

But even if Defendant is correct that the reasons for Rule 412's enactment are imperfectly served in the present context, "that would not give trial courts license to override the protective legislative judgment embodied in Rule 412 which . . . 'encourages victims of sexual misconduct to . . . participate in legal proceedings against alleged offenders' by protecting them from disclosure of such intimate information 'in most instances.'"  *A.S.*, 939 F.3d at 1075 (ellipses in original) (quoting Fed. R. Evid. 412 (ACNs)).  "Courts are not free to independently create ad hoc exceptions . . . to the legislative judgment that Rule 412 embodies."  *Id.*  Moreover, we cannot say the policy concerns animating Rule 412's evidentiary bar are entirely absent here.  Notwithstanding the YouTube videos' availability to the public, we have little doubt that in the formal setting of a federal courtroom with both family members and strange adults present, any introduction or discussion of the videos aimed at "the infusion of sexual innuendo into the factfinding process" would not only be highly embarrassing and discomforting to D.P., but also perceived by her, a youngster of fourteen at the time of trial, as an invasion of privacy. *See id.* (rejecting A.S.'s argument that the safeguards of a juvenile adjudication rendered Rule 412 inapplicable).

15

B.

Because Federal Rule of Evidence 412(a) proscribed the video evidence Defendant sought to introduce at trial, our remaining task is to determine whether the Constitution nevertheless required admission of such evidence. *See* Fed. R. Evid. 412(b)(1)(C). Defendant says the district court violated his constitutional rights because it prohibited him from confronting D.P. with highly probative evidence bearing on her credibility as a witness and he had no way of rebutting the Government's argument in closing that she did not fabricate her sexual abuse allegations against him. Because Defendant does not argue the constitutional analysis under the Fifth Amendment's Due Process Clause (the right to present a complete defense) differs from the analysis under the Sixth Amendment's Confrontation Clause (the right to confront witnesses), here we treat the former as coterminous with the latter.

We begin our discussion of Defendant's constitutional claim with our decision in *A.S.* Acknowledging Rule 412(a)'s applicability to the facts of his case, A.S., a juvenile, argued that by limiting the scope of his cross-examination of the alleged victim and refusing to admit extrinsic evidence concerning her prior unproven allegation of sexual assault against a third party, the district court erroneously excluded "'patently relevant evidence bearing directly'" on her credibility and deprived him of his Sixth Amendment right to confront his accuser. 939 F.3d at 1072. Rejecting A.S.'s argument, we held "the Constitution does not mandate the admission of . . . general impeachment evidence." *Id.* at 1074. We explained: "A.S.'s problem . . . is that the class of cases in which evidence otherwise barred by the rape shield [rule] has been deemed to be *constitutionally compelled*

16

is restricted to those which demonstrate a theory of witness bias or motive to lie." *Id.* at 1073 (emphasis added) (internal quotations omitted). "But A.S. does not argue . . . that [the victim's] prior sexual history with [another] would have made her biased against him or indicated that she had a motivation to lie about their sexual encounter." *Id.* at 1074.

Our holding in *A.S.* follows from the Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308 (1974), and its progeny. In *Davis*, a key prosecution witness on probation at the time of his testimony was a possible suspect in the subject burglary. The Supreme Court held the trial court's refusal to allow defendant to impeach the witness with these facts violated his Sixth Amendment right to confrontation. The Court so held because such evidence exposed the witness's possible bias or prejudice in favor of the Government. In other words, the evidence suggested the witness had a motive to lie to avoid having his probation revoked or, worse yet, being charged with a crime. The Court explained admission of the evidence was constitutionally required because it was "effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness[.]" *Id.* at 316; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) ("[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in . . . cross-examination designed to show a prototypical form of bias on the part of the witness[.]").

Importantly, the *Davis* Court distinguished between a "general attack" on credibility in which a party seeks to afford the jury a basis to infer the witness's character is such that her testimony might be untrustworthy and a "more particular attack" on credibility "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as

17

they may relate directly to issues or personalities in the case at hand." *Davis*, 415 U.S. at 316. In a separate concurring opinion, Justice Stewart "emphasize[d]" the Court did not hold or suggest "the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination[.]" *Id.* at 321 (Stewart, J., concurring).[3] In *A.S.*, the Tenth Circuit relied on the distinction drawn by the majority opinion in *Davis* coupled with Justice Stewart's concurrence to conclude that cross examination as to bias or motive to lie is constitutionally protected, but cross-examination as to general credibility is not. *See Boggs*, 226 F.3d at 737.

In our case, like in *A.S.*, Defendant did not seek to introduce the proffered evidence to demonstrate bias or motive to lie on the part of the alleged victim against Defendant or in favor of the Government. Instead, as Defendant himself has pointed out, his purpose in offering evidence of the YouTube videos was to illustrate D.P.'s propensity to engage in sexual fantasy, thereby providing the jury a reason to believe D.P. may have fabricated her allegations of sexual abuse against him. But because the introduction of this evidence would have constituted a "general" rather than a "particular" attack on D.P.'s credibility,

---

[3] In *Michigan v. Lucas*, 500 U.S. 145 (1991), the Supreme Court reversed a state court's holding that notwithstanding the state's rape shield law, precluding evidence of an alleged victim's prior consensual relationship with defendant always violates the Sixth Amendment. *Lucas* therefore recognized that preclusion of such evidence was not a constitutional violation per se. The Court acknowledged that to the extent a rape shield statute "operates to prevent a criminal defendant from presenting relevant evidence, the defendant's ability to confront adverse witnesses and present a defense is diminished." *Id.* at 149. But "[t]his does not necessarily render the statute unconstitutional." *Id.*

18

Defendant's argument that exclusion of the evidence violated his Constitutional rights to present a defense and confront witnesses against him necessarily fails.

We are well aware that some commentators have argued a lack of justification for a legal canon that provides constitutional status only to a theory of impeachment demonstrating a witness's bias or motive to lie. *See* Cavallaro, *supra* at 297 (suggesting a "hierarchy of impeachment" that places bias or motive to lie above both character and contradiction as a basis for impeaching a witness in a criminal trial is "constitutionally insupportable"). But we need not address such argument because *A.S.*'s holding that the admission of general impeachment evidence is not constitutionally compelled is the law in the Tenth Circuit until the Supreme Court or Tenth Circuit sitting en banc tells us otherwise. *See United States v. Harbin*, 56 F.4th 843, 846 n.2 (10th Cir. 2022) (recognizing the Tenth Circuit rule that one panel of the Court cannot overrule a holding of a prior panel).

Defendant seeks to circumvent *A.S.*'s holding by pointing out that the Government in its closing argument repeatedly sought to bolster D.P.'s credibility before the jury. Because the district court precluded any evidence of the YouTube videos, Defendant says he had no way to rebut the Government's argument that D.P. did not fabricate her sexual abuse allegations. Although he never explicitly says so, Defendant seems to argue the Government "opened the door" in closing, rendering evidence of the videos admissible. Under appropriate circumstances, we might be sympathetic to a like argument. *See* Clifford S. Fishman, *Consent, Credibility, and the Constitution: Evidence Relating to a Sex Offense Complainant's Past Sexual Behavior*, 44 Cath. U. L. Rev. 709, 800–804 (1995) (stating that where the Government or a complainant opens the door to evidence of past

19

sexual behavior, "some courts acknowledge that the defendant may have a constitutional right to rebuttal"). After all, Rule 412 is a "rape-shield" law, not a "rape-sword" law.

But here, the Government most assuredly did not "open the door" to evidence of the YouTube videos. We have already pointed out that in these types of cases, the credibility of the accuser is of paramount importance. To serve his objective, Defendant conveniently overlooks the simple fact that his defense theory was that D.P.'s testimony was a fabrication. In his opening brief, Defendant tells us—just as he emphasized to the jury in closing—that (1) "D.P. was especially susceptible to suggestibility when she made the accusation," (2) his "defense was . . . D.P. made up her allegations," (3) "the central issue in this case [was] D.P.'s credibility," and (4) "this is a case of a false report," or, as he repeatedly referred to the Government's case in his own closing, a "false narrative." Indeed, Defendant concluded his closing argument by admonishing the jury: "Members of the jury, don't turn Sean Baker's life into a Gotcha [sic] video." For Defendant now to claim the Government's closing argument aimed at reinforcing D.P.'s credibility opened the door to admission of the YouTube video evidence seems to us incredulous.

The trial transcript well proves our point. Defendant attacked D.P.'s credibility throughout the trial. In addition to emphasizing the lack of any physical evidence, Defendant sought to place D.P.'s credibility in issue in a number of ways. Defendant pointed out that D.P. was on both anti-depressant and anti-anxiety medications when she first made her allegations of sexual abuse. Defendant reminded the jury that D.P. hallucinated the entire time while in the hospital and did not remember revealing the sexual abuse to her mother, emergency room physician, or examining nurse. Defendant

20

emphasized that D.P. was vulnerable to suggestibility because she was a preteen whose mother had repeatedly asked her whether anyone was touching her inappropriately. Defendant inferred D.P. had a motive to lie because Defendant was a drunk with anger issues and she was seeking to change her environment.

Despite preclusion of the video evidence, Defendant too, through leading questions, sought to establish D.P.'s propensity to sexual fantasy in a variety of ways. Defendant asked D.P. about writing "sexual content" into a journal. Undoubtedly hoping she might open the door herself, Defendant, with the district court's blessing, asked D.P. generally about "a lot of videos" she posted on YouTube. Defendant also raised the topics of "Gacha" videos and anime with both D.P. and Investigator Sands. Defendant asked D.P. if she knew anime could be "sexual in nature." He asked Investigator Sands about the "suggestive and sexual" nature of anime and raised the possibility of a connection between anime and later sexual abuse accusations. Defendant's case-in-chief consisted of one expert witness who testified—not surprisingly—about the likelihood of false allegations in sexual abuse cases.

In stark contrast to the present case, our decision in *United States v. Begay*, 937 F.2d 515 (10th Cir. 1991), provides a good illustration of what "opening the door" to evidence of an alleged victim's sexual behavior actually looks like in a sexual abuse prosecution. There, we held the district court erroneously restricted defendant's right of cross-examination by excluding evidence of the alleged rape victim's prior sexual activity.[4] As

---

[4] Though we couched our decision in constitutional terms, this was unnecessary. Under the version of Rule 412 in effect at the time, if the trial court determined the

part of its case-in-chief, the Government "relied heavily on" the examining doctor's trial testimony about injuries the victim allegedly suffered as a result of the subject assault, specifically an "'unusually' large hymenal opening and a 'streaky area that [the doctor] considered to be an abrasion of some sort.'" *Id.* at 518–20 (internal ellipses omitted). The Government also "relied heavily on" the doctor's testimony about the victim's injuries at closing. *Id.* at 523 (repeatedly pointing out that the medical evidence was consistent with the Government's claim that defendant sexual assaulted the victim).

During defendant's rejected offer of proof, however, the doctor explained that he could not determine from the physical exam whether the victim's injuries were caused by defendant or during prior encounters with another man. *Id.* at 519. In connection with this offer, the victim's brother would have testified he saw the other man assault the victim on three previous occasions immediately preceding the alleged incident with defendant. *Id.* Making the defendant's position stronger still, the other man had pled guilty to aggravated sexual assault upon the victim. *Id.* We explained defendant's ability to cross-examine the alleged victim with such evidence was critical to a fair trial:

> As to the presence or absence of evidence corroborating or contradicting [the victim's] testimony, there was the testimony of [the examining doctor] about [the victim's] physical condition consisting of the enlarged hymenal opening and an area indicating abrasion. However, his testimony could not be

---

proffered evidence of prior sexual behavior was relevant and its probative value outweighed the danger of unfair prejudice, the evidence was admissible. *Begay*, 937 F.2d at 517–18 n.4; s*ee* Fed. R. Evid. 403. We stated: "[T]here was an abuse of discretion in holding that such evidence was more prejudicial than probative for purposes of Rule 403 and 412. Furthermore, . . . the evidence should have been admitted as constitutionally required to protect [defendant's] rights under the Confrontation Clause." *Begay*, 937 F.2d at 523. In view of our former statement, the latter statement was unnecessary to a resolution of the case.

subjected to critical cross-examination because the court let only the evidence of the enlarged hymenal opening and the abrasion in, but not the important rejected evidence from the doctor that it was impossible to determine from [the victim's] physical examination alone whether her [injuries] were caused by [defendant] or an earlier assailant.

*Id.* at 525.

To state the obvious, the present case bears little resemblance to *Begay*. Defendant cannot dispute that he attacked D.P.'s credibility throughout the trial with questions designed to persuade the jury that D.P. was prone to suggestibility and had a propensity to sexual fantasy. Consequently, to "open the door" to the YouTube video evidence, the Government would have had to do something more than tell the jury—however many times—that the evidence established D.P. was incapable of fabricating her sexual abuse allegations against Defendant.[5]

\* \* \*

For all the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[5] For instance, the Government might have opened the door if permitted to introduce evidence of the YouTube videos to suggest to the jury that the videos were a veiled outcry from D.P. for help, much like the undetected hints of sexual abuse she offered her classmates may have been. But these are not the facts of our case, and as the saying attributable to John Adams goes, facts are stubborn things.

23